UNITED STATES of America, Plaintiff,

v.

Oscar McMURRAY, a/k/a "Osama Omar," Tracy N. Lomax, a/k/a "Sauce," and Stephanie Lomax, a/k/a Stephanie McMurray, Defendants.

No. 8:CR92–00012.

United States District Court, D. Nebraska.

Sept. 30, 1993.

Maria Leslie, Sp. Asst. U.S. Atty., Omaha, NE, for plaintiff.

Stuart Dornan, Omaha, NE, for Oscar McMurray.

Lawrence G. Whelan, Omaha, NE, for Tracy Lomax.

Susan Koenig–Cramer, Omaha, NE, for Stephanie Lomax.

## MEMORANDUM AND ORDER

KOPF, District Judge.

I have before me various objections to the Presentence Reports (PSR's) prepared for the above-captioned defendants. This case involves sentences under the Sentencing Reform Act of 1984. Because of the severity of the potential sentences, I shall issue this memorandum rather than resolve the objections by abbreviated order.

### I.

#### A.

The defendants, who previously resided in Portland, Oregon, were each found guilty by a jury of conspiracy to distribute "crack" cocaine in Omaha, Nebraska, in violation of 21 U.S.C §§ 846 and 841(a)(1) and related offenses.[1] The probation officer has recom-

---

1. On October 22, 1992, a ten-count Superseding Indictment was filed in the District of Nebraska charging Oscar McMurray (a/k/a Osama Omar), Tracy N. Lomax (a/k/a "Sauce"), Amber Allen, Floyd L. Russell (a/k/a "Lee"), and Stephanie Lomax (a/k/a Stephanie McMurray) in Count I with Conspiracy to Distribute and Possession With Intent to Distribute 500 Grams or More of Cocaine or 50 Grams or More of Cocaine Base, between April 1, 1988, through November 30, 1991, in violation of 21 U.S.C. §§ 846 and 841(a)(1); Count II charged Tracy N. Lomax with Distribution of Cocaine Base between April 1, 1989, and August 31, 1989, in violation of 21 U.S.C. § 841(a)(1); Count III charged Oscar McMurray and Tracy N. Lomax with Distribution

mended a finding that the quantity of "crack" involved in the conspiracy and foreseeable to each defendant amounts to over 12.6 kilos of the substance.[2]

Defendant Tracy N. Lomax (T. Lomax) is an unmarried, 33–year–old, African–American male with six dependents.[3] He has a high-school diploma and some college training. He was last employed in 1992 as manager of an arcade.

The probation officer set T. Lomax's base offense level at 40, increased it by 2 points for possession of a firearm, and increased it again by 4 points for his leadership role in the offense. The total offense level calculated by the probation officer was 46. The probation officer found that T. Lomax's criminal history score was 7, producing a criminal history category of IV. The guideline range is nothing less than life in prison.

Defendant Stephanie Lomax (S. Lomax) is a 25–year–old, African–American female and T. Lomax's cousin. She is unmarried, pregnant, and has two dependents. She has earned her GED. She has received public assistance for the last four years, but was employed for a time at the arcade where T. Lomax worked.

The probation officer set S. Lomax's base offense level at 40, and increased the level by 4 points for her leadership role in the offense. The total offense level calculated by

the probation officer was 44. The probation officer found that S. Lomax's criminal history score was zero, producing a criminal history category of I. The guideline range is nothing less than life in prison.

Defendant Oscar McMurray (McMurray) is a 23–year–old, African–American male and T. Lomax's half brother. He is unmarried and has no dependents. He has a ninth grade education. He has had no verifiable employment for periods of time exceeding one month during the last few years. McMurray has been diagnosed by both defense and court-appointed psychiatrists as suffering from a major mental illness known as bipolar disorder (commonly referred to as manic depression). He takes lithium by prescription to deal with the disorder. McMurray admitted possession of 14 grams of "crack" on October 11, 1988, but defended the criminal charges against him at trial, primarily on the basis of diminished capacity and insanity. On the first day of trial, McMurray tried twice to enter a plea of guilty to the charges, but withdrew the tendered pleas when he became uncertain what he wanted to do.

The probation officer set McMurray's base offense level at 40, increased it by 2 points to account for a gun, and then decreased it by 2 points to account for McMurray's minor role

---

of Cocaine Base between October 4, 1988, and October 11, 1988, in violation of 21 U.S.C. § 841(a)(1); Count IV charged Jacqueline Fleming and Stephanie Lomax with Distribution of Cocaine During August, 1990, in violation of 21 U.S.C. § 841(a)(1); Count V charged Jacqueline Fleming and Stephanie Lomax with Distribution of Cocaine between September 1, 1990, and December 31, 1990, in violation of 21 U.S.C. § 841(a)(1); Count VI charged Tracy Lomax and Jacqueline Fleming with Distribution of Cocaine and Cocaine Base between January 1, 1991, and May 24, 1991, in violation of 21 U.S.C. § 841(a)(1); Count VII charged Floyd L. Russell and Cynthia Gamble with Distribution of Cocaine Base between March 1, 1991, and November 7, 1991, in violation of 21 U.S.C. § 841(a)(1); Count VIII charged Troy Brooks with Distribution of Cocaine on May 24, 1991, in violation of 21 U.S.C. § 841(a)(1); Count IX charged Troy Brooks with Interstate Travel in Aid of a Racketeering Enterprise, i.e., Distribution of Cocaine, between May 15 and May 25, 1991, in violation of 18 U.S.C. § 1952(a)(3); and Count X charged Tracy N. Lomax with Use of a Telephone to

Distribute Cocaine, in violation of 21 U.S.C. § 843(b).

Each of the substantive counts contained allegations against some of these defendants, asserting that the crimes were committed in furtherance of the conspiracy alleged in Count I. *Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Counts II and III made no such allegations against Ms. Lomax. The jury found defendants Tracy N. Lomax and Oscar McMurray guilty on all ten counts, and defendant Stephanie Lomax guilty of Count I and Counts IV through X. The other named defendants either pled guilty or were not prosecuted on the federal charges.

2. The 1992 Guidelines Manual was used, and no party objects to its use. See United States Sentencing Commission, Guidelines Manual (Nov. 1992).

3. Each of the defendants has taken a Muslim name. Intending no disrespect, I refer to them by their Anglo names because that is how they were indicted.

in the offense. The total offense level calculated by the probation officer was 40. The probation officer found that McMurray's criminal history score was 3, producing a criminal history category of II.[4] The guideline imprisonment range is 324 to 405 months.

I have previously tentatively denied, (Filing 390), all defense objections to the respective Presentence Reports. However, because I felt certain of the objections warranted an evidentiary hearing, I conferred with counsel on my own motion and scheduled and held such a hearing. After the hearing was concluded, the parties requested an additional opportunity to brief these issues. I have considered the briefs and the arguments of the parties.

### B.

I now find and conclude that the PSR (including the addendum) for T. Lomax is correct as a matter of fact and correct as a matter of law. I adopt the PSR (including the addendum) as my statement of fact and law as supplemented by this memorandum opinion.

I now find and conclude that the PSR (including the addendum) for S. Lomax is correct as a matter of fact and correct as a matter of law with the exception that S. Lomax's role in the offense should be adjusted downward 1 point to reflect her status as a manager or supervisor, but not a leader. I adopt the PSR (including the addendum) as my statement of fact and law as supplemented and modified by this memorandum opinion.

I now find and conclude that the PSR for McMurray is correct as a matter of fact and correct as a matter of law with the exceptions that (a) McMurray's proper criminal history category is II, not III, (b) the amount of "crack" attributable to McMurray is 468 grams, not 12.6 kilos, and (c) the court should depart downward under U.S.S.G. § 5K2.13 due to the diminished capacity of the defen-

dant. I adopt the PSR (including the addendum) as my statement of fact and law as supplemented and modified by this memorandum opinion.

My reasons for these findings and conclusions are set forth in the following portion of this memorandum.[5]

### II.

The defendants have raised the following objections to my tentative findings: (a) that the treatment of "crack" cocaine versus powder cocaine under the Guidelines violates the Constitution; (b) that the Sentencing Commission did not contemplate the disproportionate impact of the "crack" guidelines on African Americans and that, as a result, the court should depart downward under U.S.S.G. § 5K2.0, p.s., in order to ameliorate such discriminatory impact; (c) that there is not adequate proof that the substance involved in this case was in fact "crack" cocaine; (d) that the probation officer's calculation of the amount of "crack" cocaine involved in this conspiracy is in error; (e) that the amounts of "crack" attributed to each defendant by the probation officer are in error in that such amounts were not reasonably foreseen by the defendants; (f) that the probation officer should not have increased McMurray's offense level because of a gun; (g) that the probation officer should have reduced McMurray's offense level for acceptance of responsibility; (h) that the court should depart downward in McMurray's case because of his mental illness; and (i) that the probation officer erred in setting S. Lomax's role in the offense as a "leader/organizer."

### A.

■ The defendants argue that the "crack" guidelines violate the Constitution. The defense argument is twofold: (1) it is irrational to treat "crack" differently from cocaine in powder form and therefore such treatment denies the defendants substantive due process of law; and (2) the harsh "crack" guidelines have a disparate impact upon African Americans and therefore these African—

---

4. I have confirmed with the probation officer that paragraph 81 of the PSR is in error when it states that McMurray's criminal history category is III.

5. I shall address only those objections raised at the evidentiary hearing. My tentative findings, (Filing 390), to which there has been no objection, resolved all other issues.

American defendants have been denied equal protection of the law. I reject each of these arguments because binding precedent compels me to do so.

The "crack" guidelines, (U.S.S.G. § 2D1.1(a)(3) & (c)(13), Drug Quantity & Drug Equivalency Tbls.), "treat one gram of cocaine base the same as one hundred grams of cocaine." *United States v. Buckner,* 894 F.2d 975, 977 (8th Cir.1990). This treatment was predicated upon a congressional directive:

> In determining the sentencing *ranges* for drug offenses, the United States Sentencing Commission began with the *minimum* penalties set forth by Congress in 21 U.S.C. § 841(b) (1982 & Supp. V 1987). The "100 to 1 ratio" of cocaine to cocaine base in the Guidelines is derived directly from Section 841(b), which mandates the same minimum sentence for crimes involving 50 grams or more of a substance containing cocaine base as it does for crimes involving 5,000 grams or more of ordinary cocaine. *Compare* 21 U.S.C. § 841(b)(1)(A)(iii) (1982 & Supp. V 1987) *with* § 841(b)(1)(A)(ii)(II) (1982 & Supp. V 1987). Clearly, the United States Sentencing Commission only implemented a congressional directive set forth by statute when applying the "100 to 1 ratio" to its delineation of sentencing ranges. In *Mistretta v. United States,* 488 U.S. 361 [410], 109 S.Ct. 647, 675, 102 L.Ed.2d 714 (1989), the Supreme Court held constitutional Congress's power to implement its directives in this way. Therefore, the sole question before us in deciding Buckner's substantive due process challenge is whether the decision by Congress to apply a "100 to 1 ratio" is constitutional.

*Id.* at 978 (footnotes omitted).

Thus, in *Buckner,* the United States Court of Appeals for the Eighth Circuit found that

due deference should be given to the Guidelines inasmuch as they represent a congressional mandate. *Id.* at 978. Reviewing the legislative history of Congress's deliberations on "crack," the *Buckner* court found that "[m]embers of Congress considered cocaine base [crack] to be more dangerous to society than cocaine because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence." *Id.* (footnote omitted). As a result, the *Buckner* court held that the "100 to 1" ratio "is rationally related to Congress's objective of protecting the public welfare." *Id.* at 980.

The *Buckner* decision resolves the defense challenge in this case that the guideline treatment of "crack" is not rational. Whether "crack" is in fact more dangerous than powder cocaine is not open for debate in this court.[6] The court of appeals has held that the treatment of "crack" by Congress, and later the Sentencing Commission, was rational, and I am bound by that decision. I shall therefore deny the defense objection that the guideline treatment of "crack" is not rational.

■ I turn next to the argument that the defendants are denied equal protection of the law because a disproportionate number of blacks are subjected to harsh sentences under the "crack" guidelines. Relying on data developed in another case from this district (United States v. Majied, No. 8:CR91–00038, 1993 WL 315987), the defendants assert that over 90 percent of the defendants prosecuted in federal court for "crack" violations are black. The evidence supports such an assertion, and the government does not dispute the statistics.

Indeed, from October 1, 1991, through September 30, 1992, over 90 percent of the

---

6. I note that there was a substantial body of medical evidence presented to me which would indicate that "crack" is particularly dangerous. S. Levine et al., Cerebrovascular Complications of the Use of the "Crack" Form of Alkaloidal Cocaine, 323 New Eng.J.Med., No. 11, at 699–704 (Sept. 11, 1990) (there is a strong temporal association of the use of "crack" cocaine with strokes) (Ex. C20); M. Khalsa et al., Smoked Cocaine: Patterns of Use and Pulmonary Consequences, J. Psychoactive Drugs, Vol. 24(3), at 265–71 (July–Sept. 1992) (there is a high frequency of occurrence of acute respiratory symptoms in temporal association with cocaine smoking) (Ex. C22); R. Schwartz et al., "Crack" Use by American Middle–Class Adolescent Polydrug Abusers, 118 J. Pediatrics, No. 1, at 150–55 (Jan. 1991) (the use of "crack" by middle-class adolescents is associated with rapid addiction and with serious behavioral and medical complications) (Ex. C23).

defendants federally prosecuted in "crack" cases in this district (92.3 percent) and nationally (90.7 percent) were black.[7] (Exs. C24 & C25.) See also R. Berk, Preliminary Data on Race and Crack Charging Practices in Los Angeles, reprinted in 6 Fed.Sentencing Rep. 36, 37 (1993) (in "crack" cases prosecuted in federal court in Los Angeles, 83 percent of defendants were African American, 16 percent were Latina/o and none were Anglo). Conversely, whites are more likely than blacks to be charged with powder cocaine violations in this district (50 percent v. 15.8 percent) and nationally (32.4 percent vs. 26.5 percent). (Exs. C24 & C25.)

The defendants assert that these figures establish a violation of their equal-protection rights because blacks are more frequently and disproportionately[8] penalized under the harsh "crack" guidelines than are whites, while whites are more frequently charged with powder cocaine violations which produce comparatively lighter sentences.[9] Once again, I reject the defense arguments because precedent compels me to do so.

In *United States v. Lattimore*, 974 F.2d 971 (8th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993), the United States Court of Appeals considered and rejected a nearly identical equal-protection challenge to the "crack" guidelines. The court concluded that there "is not the slightest bit of evidence which would indicate that Congress or the Sentencing Commission had a racially discriminatory motive with the extended sentences for crack felonies." *Id.* at 975. Thus, because the Guidelines were rational according to *Buckner* and there was no evidence of discriminatory motive, the *Lattimore* court did not believe that disparate-impact statistics were

sufficient to prove an equal-protection violation: "On their face, however, these numbers[10] do not indicate a violation of equal protection in the federal constitutional sense." *Id.*

The court explicitly noted that evidence of disparate impact was for Congress or the Sentencing Commission to consider and not the courts:

This is not to say that a racially disparate impact is not a serious matter. Either Congress or the Sentencing Commission might decide to change the Guidelines or the harsh mandatory minimum sentences for crack offenses. They might believe, as a matter of policy, that racial disparities in sentencing are a good reason for such a change. It is for them, not the courts, to make this decision. Our job is to decide whether the Guidelines or the statute run counter to equal-protection principles in the constitutional sense. We hold that they do not.

*Id.* at 976.

Therefore, regardless of the nearly overwhelming statistical evidence that blacks are prosecuted much more frequently and "disproportionately" for "crack" violations than whites and that blacks are consequently much more likely than whites to be subjected to harsh sentences under the "crack" guidelines, *Lattimore* requires me to reject the defendants' equal-protection claims.

**B.**

The defendants assert that I should follow the lead of the Honorable Lyle E. Strom, Chief Judge of the United States District Court for the District of Nebraska, in United

---

7. African Americans are currently about 3.6 percent of Nebraska's population. Nebraska Blue Book at 56 (1992–93 ed.). African Americans currently comprise about 12.1 percent of the population nationwide, while whites currently comprise about 80.3 percent of the population. 1990 Census, Vol. 1, Ch. B., General Population Characteristics, Tbl. Race and Hispanic Origin for the United States.

8. I understand "disproportionately" to mean "out of proportion"; that is, African Americans as a class are sentenced more frequently for "crack" offenses than the proportion of blacks as

a class in the general population would otherwise dictate.

9. The defendants do not assert that as individuals they have been selectively prosecuted because of their race.

10. In *Lattimore*, the court observed that in one 1988 study 96.6 percent of those charged with crack offenses were black and 79.6 percent of those charged with powder cocaine violations were white. *Id.* at 975. That data was apparently derived from a Minnesota study.

States v. Majied, No. 8:CR91–00038 (D.Neb. July 29, 1993) (Judgment Including Sentence Under the Sentencing Reform Act), and depart from the Guidelines under U.S.S.G. § 5K2.0, p.s.[11] Reluctantly, I conclude that I cannot follow Judge Strom's thoughtful and sensitive opinion.

In Majied, a "crack" case, Judge Strom concluded that he should depart under U.S.S.G. § 5K2.0, p.s., because the Sentencing Commission had not considered the disparate impact of the "crack" guidelines on blacks. Judge Strom wrote:

> Title 18, U.S.C. § 3553(b), provides that the Court may depart from the sentencing guideline range if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

USSG § 5K2.0 of the Guidelines reiterates that statement and goes on to provide that, "nonetheless this subpart seeks to aid the Court by identifying some of the factors that the commission has not been able to take into account fully in formulating the guidelines. Any case may involve factors, in addition to those identified, that have not been given adequate consideration by the commission. Presence of any such factor may warrant departure from the guidelines under *some circumstances in the discretion of the sentencing court.*" (emphasis added.)

In determining whether such a circumstance was adequately taken into consideration, the statute further provides that the Court shall consider only the guidelines, the policy statements, and the official commentary of the sentencing commission.

The defendants have previously challenged, and this defendant joined in that challenge, the constitutionality of 21 U.S.C. § 841(a) and USSG 2D1.1 because their application has had a disproportionate im-

---

11. U.S.S.G. § 5K2.0, p.s., states:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts. Nonetheless, this subpart seeks to aid the court by identifying some of the factors that the Commission has not been able to take *into account fully in formulating the guide-lines.* Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court. Similarly, the court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines (*e.g.,* as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

Where, for example, the applicable offense guideline and adjustments do take into consideration a factor listed in this subpart, departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense. Thus, disruption . of a governmental function, § 5K2.7, would have to be quite serious to warrant departure from the guidelines when the applicable offense guideline is bribery or obstruction of justice. When the theft offense guideline is applicable, however, and the theft caused *disruption of a governmental function,* departure from the applicable guideline range more readily would be appropriate. Similarly, physical injury would not warrant departure from the guidelines when the robbery offense guideline is applicable because the robbery guideline includes a specific adjustment based on the extent of any injury. However, because the robbery guideline does not deal with injury to more than one victim, departure would be warranted if several persons were injured.

Also, a factor may be listed as a specific offense characteristic under one guideline but not under all guidelines. Simply because it was not listed does not mean that there may not be circumstances when that factor would be relevant to sentencing. For example, the use of a weapon has been listed as a specific *offense characteristic under many guidelines,* but not under immigration violations. Therefore, if a weapon is a relevant factor to sentencing for an immigration violation, the court may depart for this reason.

pact on young African-American males and, therefore, denies them equal protection of the laws and due process of law as guaranteed by the Constitution. This Court, relying on *United States v. Lattimore*, 974 F.2d 971, an Eighth Circuit decision in 1992, has denied those challenges. However, it is apparent to the Court from the anecdotal evidence submitted in connection with defendants' challenge to the constitutionality of these provisions that the application of the guidelines to African-American males has been disproportionately severe.

The evidence now demonstrates that in excess of ninety per cent (90%) of the persons prosecuted for distribution or possession with intent to distribute crack cocaine or cocaine base are African-American. At the same time, the evidence is clear that the cocaine molecule is the same whether the drug being used is powder form or in crack form, and is not inherently more dangerous in crack form.

The 1:100 ratio between crack and powder reflected in the mandatory minimum sentences enacted by Congress have been a factor in driving the sentencing commission in developing the guidelines. This has resulted in sentences for crack cocaine being inordinately more severe than sentences for similar amounts of powder cocaine, and this disparity has been aggravated by the guidelines adopted in November of 1989 and subsequently. A by-product of this inordinate disparity is that members of the African American race are being treated unfairly in receiving substantially longer sentences than caucasian males who traditionally deal in powder cocaine, and this disparity simply is not justified by the evidence.

This disparate impact was not contemplated by Congress nor was it considered by the Sentencing Commission in developing the guideline ranges for users of crack cocaine.

The effect of this has been that a segment of minority members of our society are simply not being treated appropriately for the criminal conduct of which they have been found guilty.

The Court believes these factors, which are now apparent from the anecdotal evidence presented to the Court, constitute a basis for the Court departing from the guideline range.

This conclusion is fortified by the fact that the United States Sentencing Commission is re-examining its guidelines as they relate to the distinction between crack and powder cocaine and the impact these guidelines are having on certain segments of our society. This demonstrates the Commission realizes that there are factors present of which they were not aware and, therefore, did not consider, did not anticipate, and which have resulted in what some prosecutors have referred to as draconian sentences for certain drug-related offenses.

For these reasons, the Court is going to depart from the guidelines.

I cannot adhere to Majied for three reasons. First, I believe the intellectual foundation for Majied was rejected by the court of appeals in *Buckner* and *Lattimore*. Second, I believe there is evidence that Congress and the Sentencing Commission realized that harsh "crack" sentences might fall "disproportionately" on minority group members, including blacks. Third, I believe the courts are not capable of dealing with the profound policy implications implicit in any departure based on disparate impact.

**1.**

■ Judge Strom felt departure was warranted because "crack" is "not inherently more dangerous" than powder cocaine, because African Americans receive "substantially longer sentences than caucasian[s]," and because these facts were not contemplated by Congress or considered by the Sentencing Commission. I believe the decisions in *Buckner* and *Lattimore* preclude me from adopting Judge Strom's reasoning.

The *Buckner* court was persuaded that Congress had a rational basis for concluding that "crack" was a " 'new, cheaper—and far more dangerous—form of cocaine.' " *Buckner*, 894 F.2d at 979 & n. 9 (quoting the legislative history, including 132 Cong.Rec. S14293 (daily ed. Sept. 30, 1986) (statement

of Sen. Kennedy)). Thus, I believe that to the extent Judge Strom concluded that "crack" is not more dangerous than powder cocaine, and therefore the differences in treatment under the Guidelines are not rational, the *Buckner* decision precludes such a holding.

Likewise, the *Lattimore* court specifically considered, but rejected, the argument that disparate impact alone was a justification for departure under the Guidelines. 974 F.2d at 975. *Lattimore* involved an appeal by the government after the district court departed downward. Despite the statistical evidence of disparity, *id.* at 975, and over a strong dissent by Judge Bright that the district judge in *Lattimore* properly considered evidence of racial disparity, a fact not considered by the Sentencing Commission, *id.* at 977, the *Lattimore* court held that it was for Congress and the Sentencing Commission, not the courts, to address such disparities. *Id.* at 976. Thus, I believe that to the extent Judge Strom's departure is predicated upon the failure of the Sentencing Commission to realize and deal with the existence of the disparate impact of the "crack" guidelines, *Lattimore* precludes a departure for that reason.

In summary, the decisions in *Buckner* and *Lattimore* preclude a downward departure based on the lack of rationality of the "crack" guidelines or the statistical evidence of racial disparity in the application of the "crack" guidelines.

### 2.

■ Unlike Judge Strom, who believed that the "disparate impact was not contemplated by Congress," I believe that the legislative history of congressional efforts to stop the flow of "crack" strongly suggests that Congress was aware that African Americans would be "disproportionately" prosecuted for "crack" violations.[12] Since the Sentencing

Commission used the "100 to 1" ratio Congress adopted when formulating the "crack" Guidelines, *Buckner*, 894 F.2d at 978, I believe the Sentencing Commission was aware of this data as well.

By virtue of the 1980 census, Congress clearly knew in 1986 that African Americans disproportionately populated American urban areas. See 1980 Census, Vol. 1., Ch. B., General Population Characteristics, Tbl. 69, Persons by Race and Sex for Areas and Places: Urbanized Areas. For example, the 1980 census revealed that while African Americans constituted about 11.7 percent of the national population and whites about 83.1 percent, blacks outnumbered whites in Detroit, Michigan, almost two to one (758,939 to 413,730). *Id.*

When it was considering the then relatively new phenomenon of "crack" cocaine in 1986, Congress clearly was informed that the "crack" problem especially impacted poor people in general and blacks in particular,[13] both as victims and as perpetrators. Congress was informed that the retail sale of "crack" was being conducted primarily by the urban poor, including black "retailers." Thus, Congress knew or should have known that when it chose a sentencing approach that targeted the retail sale of "crack," the effect would also be to target the urban poor, including African Americans.

The National Drug Enforcement Policy Board, chaired by the Attorney General, informed Congress in September, 1986, that "with rare exception, crack trafficking takes place in the inner-city at the retail level and is a criminal activity that as yet, is unorganized, consisting instead of a variety of cottage industry 'crack houses.'" Nat'l Drug Enforcement Policy Bd., Report to Congress on Crack Cocaine at 3 (Sept.1986) (Ex. C17).

---

12. I do not mean to imply, however, that Congress had a discriminatory motive.

13. However, this information can be misunderstood or misapplied. Although the data suggests that blacks and Hispanics are twice as likely to smoke "crack" cocaine as whites, given similar social and environmental conditions, crack use probably does not depend upon race-specific factors. M. Lillie–Blanton et al., Probing the Mean-

ing of Racial/Ethnic Group Comparisons in Crack Cocaine Smoking, 269 JAMA, No. 8 (Feb. 24, 1993) (examining the meaning of data collected in the 1988 National Household Survey on Drug Abuse published in National Household Survey on Drug Abuse: Main Findings 1988, Nat'l Inst. on Drug Abuse, U.S. Dept. Health & Human Servs. Publication ADM 90–1692 (1990)) (Ex. C26).

Congress was given specific examples of the pervasive impact of "crack" in the black community. In July, 1986, Joel Gilliam, Inspector, Narcotics Division, Detroit Police Department, told a House Select Committee considering the "crack crisis" that:

> In Detroit we find that our primary method of distribution is local family or extended family groups that have limited, if any, connection with the traditional organized crime figures. Now, that is to say that what we see in the streets of the city of Detroit are primarily those people that are in a predominantly black community....[14]

The Crack Cocaine Crisis: Joint Hearing Before the Select Comm. on Narcotics Abuse and Control, House of Representatives, and the Select Comm. on Children, Youth, and Families, House of Representatives, 99th Cong., 2d Sess. 75 (July 15, 1986) (hereinafter "The Crack Cocaine Crisis") (Ex. C16).

In fact, Inspector Gilliam testified that "Young Boys Inc."—which he described as "a major drug ring"—"became the status symbol of success for black teenage males on the streets of the City of Detroit." *Id.* at 173. Gilliam further testified that the crack cocaine crisis had produced such negative role models that if one asked an "inner city black youth what he wants to be in the future, ... don't be surprised if he says, 'a major dope dealer.'" *Id.* at 174.[15]

The chairman of the House Judiciary Committee recognized that while "crack" use "appears to cross all racial, social and economic boundaries ... it has hit young people in inner cities particularly hard." *Id.* at 96 (statement of Rep. Rodino). The chairman emphasized that one observer believed "the 'crack' business has become the largest single employer of inner city youth." *Id.*

In October, 1986, in response to the "crack" crisis, Congress amended the law by adopting the so-called "100 to 1" ratio. Anti-Drug Abuse Act of 1986, Title IA, Narcotics Penalties and Enforcement Act of 1986, Pub.L. No. 99–570, § 1002, 100 Stat. 3207, 3207–2 to 3207–4 (1986) (fifty grams of "crack" would produce the same penalty as five kilograms [16] of cocaine—not less than ten years in prison and not more than life in prison; five grams of "crack" would produce the same penalty as 500 grams of cocaine—not less than five years in prison and not more than 40 years) (codified as: 21 U.S.C. § 841(b)(1)(A)(ii)(II) (5 kilograms of cocaine); 21 U.S.C. § 841(b)(1)(A)(iii) (50 grams of "crack"); 21 U.S.C. § 841(b)(1)(B)(ii)(II) (500 grams of cocaine); 21 U.S.C. § 841(b)(1)(B)(iii) (5 grams of "crack")). The Act became effective on November 1, 1987, the same date the Guidelines went into effect. *Id.*, Pub.L. No. 99–570, § 1004(b), 100 Stat. 3207–6.

As the *Buckner* court acknowledged, the "100 to 1" ratio was clearly intended by Congress to "plug the loophole" perceived in the then-existing penalty structure which treated "crack" as no more dangerous than cocaine. *Buckner*, 894 F.2d at 979 (quoting the statement of Sen. D'Amato, 132 Cong. Rec. § 8092 (daily ed. June 20, 1986)) (Ex. C13). Moreover, as the *Buckner* court pointed out, Congress intended this legislation to harshly punish not only "major traffickers" but also " 'the managers of the retail level of traffic.'" *Id.* at n. 10 (quoting H.R.Rep. No. 845, 99th Cong., 2d Sess. 11–12 (1986)).

---

**14.** This commentary was not limited to Detroit. A witness from Washington, D.C., stated that "in Washington, DC, it is probably the same kind of problem." *Id.* Another witness from New York City stated, "We do notice, as Commissioner Holliday has said, the emergence of other groups that likewise organize—oriental, blacks, and Hispanics, who are heavily involved in cocaine trafficking because of the enormous profits involved. However, in the distribution and sale of crack at the street level, this has become a cottage industry. There are entrepreneurs involved. It is made in kitchens, as we all know, and it is being distributed by a host of people, including children of school age." *Id.* at 76.

**15.** At the same time, in Detroit/Wayne County, Michigan, which accounted for more than 25 percent of the population of the State of Michigan, blacks were more than twice as likely as whites to be admitted to hospitals for treatment of cocaine abuse problems (69 percent black vs. 30 percent white). *Id.* at 185 (R. Calkins, Drug Abuse Trend UpDate Detroit/Wayne County, Michigan (Dec. 1985)).

**16.** One kilogram is equal to 1,000 grams. United States Sentencing Commission, Guidelines Manual at 92 (Nov. 1992) (Measurement Conversion Tbl.).

Quoting the House Committee on the Judiciary, the *Buckner* court noted that Congress had concluded that "the 'managers' who do business with 'substantial street quantities' are 'serious traffickers because they keep the street markets going.'" *Id.* at n. 10. According to the *Buckner* court, this was a congressionally mandated "market approach" to sentencing. *Id.* (quoting *United States v. Malone*, 886 F.2d 1162, 1166 (9th Cir.1989)).

Congress must have known when it adopted such a "market approach" to sentencing that a disproportionate number of poor people in general, and blacks in particular, would be sentenced under the harsh "crack" penalty structure enacted. After all, Congress had been specifically advised that "with rare exception, crack trafficking takes place in the inner-city at the retail level," (Ex. C17), and this fact was acknowledged by the likes of the chairman of the House Judiciary Committee: "It has hit young people in inner cities particularly hard." (Ex. C16.) If, indeed, "crack" trafficking was particularly striking the inner city and particularly hitting inner city youth, it should have surprised no one that the residents of the inner city, including blacks, would be disproportionately subjected to the penalty structure adopted by Congress to implement its "market approach" to sentencing.

But what of the Sentencing Commission?

According to a guideline development analyst with the Sentencing Commission, in 1986 the Sentencing Commission had been drafting guidelines which used parole guidelines as a basis for sentencing guidelines. R. Scotkin, The Development of the Federal Sentencing Guidelines for Drug Trafficking Offenses, Crim.L.B., 50, 51–52 (Jan.–Feb. 1990) (Ex. C21). The parole guidelines used a two-dimensional grid with seriousness of the offense on one pole and likelihood of recidivism on the other. *Id.* at 51. The "seriousness of the offense" in a drug case was determined by three factors: the nature of the sub-stance, the weight of the mixture containing the substance, and the purity of the substance. *Id.*

However, an "external factor intervened," and that factor was the Anti–Drug Abuse Act of 1986:

Midway through the period of the Commission's development of the initial sentencing guidelines, Congress enacted the Anti–Drug Abuse Act of 1986. Although it must be assumed that Congress was aware that sentencing guidelines were being developed, it nevertheless enacted a number of mandatory minimum sentencing provisions that *restricted the Commission's discretion in establishing guidelines for drug trafficking offenses.* Under the Anti–Drug Abuse Act, five-and ten-year mandatory minimum sentences were established for trafficking in specified weights of various controlled substances [including "crack"]. . . .

The Commission, which had not yet promulgated its initial guidelines, *responded to the passage of this legislation* by adopting the five-and ten-year mandatory minimum sentences, and the controlled substances and quantities associated with these mandatory minimum sentences, as reference points for the development of its drug trafficking offense guidelines.

*Id.* at 52–53 (emphasis added).[17]

In fact, the applicable Guidelines Manual adopts the rationale of the Anti–Drug Abuse Act of 1986 as the "primary basis for the guidelines sentences." United States Sentencing Commission, Guidelines Manual, § 2D1.1, comment. (n. 10).

In summary, inasmuch as Congress should have been fully aware that blacks would be disproportionately impacted by the draconian penalty scheme set in motion when it sought, pursuant to the Anti–Drug Abuse Act of 1986, to take a "market approach" to sentencing in "crack" cases, and as it is apparent

---

**17.** Judge Vincent L. Broderick, chairman of the Conference Committee on Criminal Law of the Judicial Conference of the United States, recently told the House Judiciary Subcommittee on Crime and Criminal Justice: "Yet before the Commission even had an opportunity to present its plan, the Commission's work was disrupted and desta-bilized, if not demoralized, with passage of a series of statuary mandatory minimum sentences applicable to cases soon to dominate the federal criminal docket." (Statement of Vincent L. Broderick, July 28, 1993, before the House Judiciary Subcomm. on Crime and Criminal Justice at 27.)

that the Sentencing Commission did not act inadvertently when it formulated the Guidelines along the lines of the Anti–Drug Abuse Act of 1986, a departure under U.S.S.G. § 5K2.0, p.s., is not warranted. To put it bluntly, Congress must take responsibility for what it has done.

### 3.

Finally, I believe the courts are not capable of dealing with the profound policy implications implicit in the proposed departure based on disparate impact.

As noted earlier, there is no evidence of racial animus towards blacks in the adoption of the "crack" penalties by Congress or the Sentencing Commission. Therefore, it is essentially a public policy question, as opposed to a legal question, whether the harsh penalties associated with "crack trafficking" should be relaxed for African Americans because they are "disproportionately" prosecuted for such activity.

On the one hand, if African Americans tend to sell "crack" cocaine rather than the powder cocaine preferred by white traffickers for socioeconomic reasons—i.e., "crack" is the poor person's equivalent of powder cocaine—it could forcefully be argued that poor people in general, and poor blacks in particular, ought not to be punished more harshly for selling "crack" than whites are for selling powder cocaine, even if "crack" is more dangerous than powder cocaine. This would be true because the socioeconomic reasons for African Americans' selling or using "crack" cocaine may be created by the racism which plagued our country in the past and which may well plague our country even now. See, e.g., M. Lillie–Blanton et al., Probing the Meaning of Racial/Ethnic Group Comparisons in Crack Cocaine Smoking, 269 JAMA 993, 996 (While "crack" cocaine smoking does not depend on race per se, this "finding, however, does not speak to the influence of social factors, such as racism, which may contribute to a disproportionate share of racial/ethnic minorities living in social environments where there is increased risk for crack cocaine use.") (Ex. C26).

On the other hand, if "crack" cocaine is as dangerous as Congress believes it to be, and poor people in general, and poor blacks in particular, are victimized more frequently by the sale of "crack" than whites, the social costs of "disproportionate" prosecution of African Americans might be deemed acceptable precisely so that other poor people, including poor blacks, are afforded some protection from the scourge of "crack."

In any case, as Chief Judge Arnold recognized in *Lattimore*, 974 F.2d at 976, these issues are for Congress and the Sentencing Commission, not the courts.[18]

---

18. I pause to note two things. First, as Judge Strom indicated, the Sentencing Commission has begun a study of the race issue. If the Commission were to change the Guidelines because of the question of racial disparity, it would be tragic and unfair not to make that change retroactive. See 18 U.S.C. § 3582(c)(2). Second, I am aware that the Sentencing Commission is considering an amendment to U.S.S.G. § 2D1.1 which would allow the court to "cap" the base offense level at 36 in certain drug cases. The amendment states:

§ 2D1.1 *Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses): Attempt or Conspiracy*

\* \* \* \* \* \*

*Commentary*
*Application Notes:*

\* \* \* \* \* \*

16. Where (A) the amount of the controlled substance for which the defendant is accountable under § 1B1.3 (Relevant Conduct) results in a base offense level greater than 36, (B) the court finds that this offense level overrepresents the defendant's culpability in the criminal activity, and (C) the defendant qualifies for a mitigating role adjustment under § 3B1.2 (Mitigating Role), a downward departure may be warranted. The court may depart to a sentence no lower than the guideline range that would have resulted if the defendant's Chapter Two offense level had been offense level 36. *Provided*, that a defendant is not eligible for a downward departure under this provision if the defendant:

(a) has one or more prior felony convictions for a crime of violence or a controlled substance offense as defined in § 4B1.2;

(b) qualifies for an adjustment under § 3B1.3 (Abuse of Position of Trust or Use of Special Skill);

(c) possessed or induced another participant to use or possess a firearm in the offense;

(d) had decision-making authority;

(e) owned the drugs or financed any part of the offense; or

(f) sold the controlled substance or played a substantial part in negotiating the terms of the sale.

## C.

The defendants next argue that the evidence is not sufficient to establish that they dealt in "crack" rather than powder cocaine. On the contrary, I believe the evidence is overwhelming on this point.[19]

The term "cocaine base" found in 21 U.S.C. § 841 is not defined in the statute or in the Guidelines. However, any chemist can tell the difference between cocaine base and cocaine hydrochloride (powder cocaine)—although chemically similar, the two substances have different solubility levels, different melting points, and different molecular weights. *United States v. Jackson*, 968 F.2d 158, 161 (2d Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992) (" '[J]ust about any chemical laboratory would be able to distinguish the difference between cocaine base and cocaine salt or other forms.' "). I have no doubt that the substance these defendants primarily dealt with was in fact "cocaine base" because a competent chemist tested some of the substance and concluded that it was "crack," taking care to distinguish between "crack" and cocaine hydrochloride (commonly thought of as powder cocaine). (Ex. 3,032: Tr. 801:9–17.)

Although there may be differences in the "refining" process between "crack" and "cocaine base" (sometimes called "cocaine freebase"), crack is essentially identical to freebase in use and effect. M. Khalsa et al., Smoked Cocaine: Patterns of Use and Pulmonary Consequences, J. Psychoactive Drugs, Vol. 24(3), at 267 (Ex. C22).[20] In fact, in this circuit, the terms "crack" and "cocaine base" mean the same thing—"smoked cocaine." *United States v. Wheeler*, 972 F.2d 927, 930 (8th Cir.1992) (holding that the court was not required to attempt a scientific definition of cocaine base because whatever else U.S.S.G. § 2D1.1 " 'encompasses it certainly includes' crack cocaine" or cocaine that could be smoked) (quoting *United States v. Brown*, 859 F.2d 974, 976 (D.C.Cir.1988)).

There was plenty of evidence that the substance in this case was "crack" or "smoked cocaine." Three examples will illustrate the point, although many more could be cited.

Ms. Fleming testified that at T. Lomax's direction she made three trips to the west coast to pick up powder cocaine. She then brought "bricks" of powder cocaine to Nebraska. She also testified that on at least one occasion she had the help of S. Lomax in hiding the powder cocaine in a stuffed animal so that she could return the drugs to Nebraska hidden in the toy. Ms. Fleming further testified that she "rocked up" the powder cocaine at the direction of T. Lomax, who had taught her how to "cook" it, and, thereafter, took some of the "rock" and smoked it herself. (Ex. 3,038: Tr. 903–920.)

Moreover, the evidence demonstrates that on four different occasions T. Lomax and S. Lomax separately sold kilo-quantity units of

---

I doubt whether T. Lomax or S. Lomax would qualify for the "cap" even if the amendment were passed primarily because of their roles in this offense. McMurray might qualify under the amendment, although he may have a disqualifying prior felony conviction for a crime of violence depending upon whether his robbery conviction in Oregon is viewed as a crime of violence. Moreover, McMurray's use of a gun in this case might disqualify him as well. Nevertheless, if the amendment is adopted, simple justice would seem to dictate that the Commission make the amendment retroactive and allow defendants such as these to seek resentencing. See 18 U.S.C. § 3582(c)(2).

**19.** It should be noted that with the exception of Officer Sanchelli's testimony at the evidentiary hearing on the objections, most of the "evidence" recited in this memorandum was presented at trial. Thus, the evidence has a relatively high degree of reliability. Counsel have identified portions of the trial transcript particularly responsive to some of the objections, and those portions of the trial transcript have been marked as exhibits for sentencing purposes. In order to distinguish between trial exhibits, which use a two- or three-digit number, the sentencing exhibits use a four-digit number except when referring to exhibits marked in the *Majied* case, which use a combination of an alphabetic character and a number, such as "C1." The *Majied* hearing transcript and related exhibits will be marked as court's exhibit 2. The transcript of the evidentiary hearing in this case will be marked as court's exhibit 3.

**20.** The word "base" is derived from the Spanish word *base* and simply means paste. *Id.* at 266. Cocaine "freebase" is the cocaine alkaloid stripped from virtually all other components of the original substance. *Id.* at 267. "Crack" exists when some of the residual salt and other impurities and diluents remain present in the consumed substance. *Id.*

"crack" cocaine to Clifford Thomas, a large-volume street dealer.[21] Thomas paid tens of thousands of dollars for the substance under the belief that it was "crack." (Ex. 2,004: Tr. 279–280.) It is likely that the substance was in fact "crack" since it is doubtful that Thomas would have continued to deal with the Lomax defendants if the substance was not what it was represented to be.

Finally, McMurray freely admits: "I was in possession of **crack cocaine** on October 11, 1988, at the New Tower Inn in Omaha, Nebraska." (PSR ¶ 34 (emphasis added).)

In summary, the scientific evidence and the lay evidence are both convincing that the substance primarily involved in this case was "crack."

## D.

■ The defendants next attack the probation officer's determination that this conspiracy involved at least 12.6 kilos of "crack" cocaine. If the "crack" involved in this conspiracy was over 5 kilograms, but less than 15 kilograms, a base offense level of 40 is assigned under the Guidelines. U.S.S.G. § 2D1.1(a)(3) & (c)(2).

The probation officer found for each of the three defendants that:

Information from the Government and Officer Steve Sanchelli of the Drug Task Force reflects that powder cocaine was transported from the West Coast to Omaha and "rocked up" in Omaha. All of the powder was converted to cocaine base on a one-to-one ratio. Testimony and/or information from numerous individuals reflects extremely large amounts of crack cocaine being distributed during the course of this conspiracy.... Troy Brooks was arrested in possession of one pound (453.6 grams) of powder cocaine. Oscar McMurray was arrested by Omaha Police in October, 1988, with 14 grams of crack cocaine; Clifford Thomas purchased a total of 4¾ kilos of crack cocaine and ¼ kilo of powder cocaine from the defendant [T. Lomax] and Ste-

phanie Lomax; Troy Brooks delivered a minimum of 2 ounces (56.7 grams) of crack cocaine for defendant [T. Lomax] or Stephanie Lomax; Jacqueline Fleming transported approximately 2½ kilos of powder cocaine from the West Coast to Omaha where it was cooked into crack cocaine; Tracy Harris transported 8 ounces (226.8 grams) of powder cocaine from LA to Omaha; Carl Johnson purchased at least 4 kilos of crack cocaine from either the defendant [T. Lomax] or Floyd Russell, who was acting at the direction of the defendant [T. Lomax]; Herman Filhiol purchased 1 ounce (28.35 grams) of crack cocaine from Floyd Russell, acting at the direction of the defendant [T. Lomax]; and Cynthia Gamble purchased a total of 11 ounces (311.85 grams) of crack cocaine from Floyd Russell. Therefore, the total amount of crack cocaine involved in this conspiracy is approximately 12,591.3 grams or 12.6 kilograms. Sec. 2D1.1(a)(3)(c)(2) provides for a Base Offense Level of 40 for offenses involving at least 5 kilograms but less than 15 kilograms of cocaine base.

(T. Lomax PSR ¶ 38. See also S. Lomax PSR ¶ 47; McMurray PSR ¶ 39.)

I find and conclude that the probation officer's calculations are generally accurate and probably conservative. I therefore adopt his findings as mine with the following comments.

The government has carefully selected from the trial transcripts portions of those transcripts which support the probation officer's calculation. (Exs. 4,000–4,032.) No useful purpose would be served by itemizing each item of evidence which supports the officer's calculation. Suffice it to say that the government has met its burden of proof.

For purposes of illustration, I shall highlight some of the evidence in which very large quantities of "crack" were involved, recognizing that the base offense level of 40 is triggered under the Guidelines when the

---

**21.** Although the defendants doubt the credibility of everyone who cooperated with the government, I generally found the government's witnesses to be credible. Indeed, the testimony of the various government witnesses tended to be corroborated. For example, Troy Brooks testified that T. Lomax had admitted to him that "Clifford Thomas used to buy half a key [kilo] from him." (Ex. 4,001: Tr. 187:20–22.)

amount of "crack" in controversy exceeds 5 kilos. U.S.S.G. § 2D1.1(a)(3) & (c)(2).

For the sake of argument, I shall omit smaller quantities of "crack." I shall also omit powder cocaine even though there was evidence of substantial amounts of powder cocaine being turned into "crack" (i.e., the Fleming evidence, (Ex. 3,038), discussed earlier, which Sanchelli estimated to involve 2 kilos [22] of powder cocaine, (Sentencing Tr. 17:19–21), and the nearly one-half kilo of powder cocaine seized from Brooks at the airport (Ex. 4,001: Tr. 117:9–10)).

For example, Clifford Thomas testified about large purchases. He stated that he purchased kilo quantities of "crack" directly from either T. Lomax or S. Lomax on separate occasions. (Ex. 2,004.)

Thomas testified that he bought half a kilo and, later, one kilo of "crack" from S. Lomax on two separate occasions. (Ex. 2,004: Tr. 280:17–284:24.) It is noteworthy that Thomas testified he dealt with S. Lomax because T. Lomax told him that if he (T. Lomax) were unavailable, Thomas should call a telephone number and the person who would answer would know "exactly what I would want." (Ex. 2,004: Tr. 282:1–19.)

Thomas testified that he bought at least one kilo of crack from T. Lomax on two separate occasions, and 9 ounces (255 grams, or about one-fourth kilo) of crack on a third occasion. (Ex. 2,004: Tr. 279:1–15; 285:2–286:24.) Thus, at least 3.75 kilos were involved in the transactions with Thomas alone.[23]

In addition, Ms. Gamble, an admitted "crack" dealer, testified that she observed a large quantity of "crack" in the possession of Floyd Russell, her source of supply and a coconspirator in this case. Russell has pled guilty, admitted managing money for T. Lomax and personally selling crack cocaine, and been sentenced. Gamble testified that Russell showed her both a "bread bag" and a "garbage bag" containing large rocks of "crack." (Ex. 3,035.)

Officer Sanchelli testified at the sentencing hearing about his interviews with Gamble in an effort to determine the weight of the two bags of "crack." As she did at trial, (Ex. 3,035: Tr. 850:18–20), Gamble likened the rocks of "crack" to the size of fruits. The bread bag contained a "crack" rock about the size of a grapefruit. (Sentencing Tr. 18:12–15.) The garbage bag contained a "crack" rock about the size of a halved cantaloupe. (Sentencing Tr. 19:12–19.) Sanchelli, a credible witness and an experienced police officer who had bought and weighed "crack" as an undercover officer, estimated the total weight of the grapefruit-like rock of "crack" cocaine to be one pound "[a]t the very least," (Sentencing Tr. 19:4–7), and the weight of the cantaloupe-like rock of "crack" to be between one and 1½ pounds. (Sentencing Tr. 20:22–25.) Thus, the Gamble evidence suggests that at least 2 pounds (over 900 grams or ⁹⁄₁₀ths of a kilo) of "crack" were in the two bags. It is worth noting that the probation officer did not include this amount in his calculations, and, as indicated earlier, his calculations are probably quite conservative.

Moreover, the testimony of Carl Johnson is also informative. (Ex. 3,025.) Johnson was a "crack" dealer who bought the drug directly from T. Lomax, watched him "rock up" "crack," and lived with him for a time. He testified that from late November, 1990, to about June, 1991, he bought an allotment of "20 quarter ounce" packages of "crack" from T. Lomax twice a week. (Ex. 3,025: Tr. 689:9–20.) This would amount to about 10 ounces (284 grams) of "crack" each week, or a total of over 6.5 kilograms (6,816 grams) of "crack" during a period of approximately six months.[24] The probation officer underes-

---

22. The government agrees that the probation officer's estimate was overstated by ½ kilo.

23. The probation officer may have been slightly high in his estimate of the Thomas transactions.

24. At one point, Johnson estimated he bought between 60 and 100 ounces of "crack" during this period of time. (Ex. 3,025: Tr. 689:21–23.)

However, I believe this testimony was the result of a computation error. Johnson was asked to estimate the quantity he purchased, and I recall observing him trying with difficulty to calculate the quantity without benefit of paper, pencil, or calculator. Since Johnson consistently described purchasing "20 quarters" twice a week, (Ex. 3,025: Tr. 688:17–23; 689:9–20), I have used that quantity rather than the lower estimate.

timated that these transactions involved "at least 4 kilos."

In summary, from these three trial witnesses alone there is evidence that this conspiracy involved well over 8 kilograms of "crack," substantially more than the amount necessary for a base offense level of 40. These transactions do not account for the proven multikilo quantities of powder cocaine which were undoubtedly transformed into "crack." These transactions also ignore smaller quantities of "crack." These transactions illustrate how conservatively the probation officer approached the task of estimating the amount of "crack" involved in this conspiracy. Accordingly, the government has met its burden of proof that this conspiracy involved at least 12.6 kilos of "crack" cocaine as detailed by the probation officer in each PSR.

### E.

All the defendants challenge the attribution of "crack" to them by virtue of the proven conspiracy on the grounds that the amounts were not foreseeable.

■ Broadly speaking, the Guidelines require that the total amount of "crack" involved in a conspiracy be attributed to each member of the conspiracy when calculating the base offense level if the amounts were "reasonably foreseeable" by the defendants as members of the conspiracy, and the sales were in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); U.S.S.G. § 1B1.3(a)(1)(B), comment. (n. 2). Compare *United States v. Adipietro*, 983 F.2d 1468, 1472, 1476 (8th Cir.1993) (discussing foreseeability) with *United States v. Jones*, 965 F.2d 1507, 1516–17 (8th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 346, 121 L.Ed.2d 261 (1992) (discussing foreseeability).

### 1.

■ As to T. Lomax,[25] the evidence is overwhelming that he could have "foreseen" virtually every aspect of this conspiracy, including the quantities of "crack" distributed

by his codefendants. I expressly find that 12.6 kilos of "crack" could have been reasonably foreseen by T. Lomax as being distributed by the conspiracy of which he was the head.

I have recounted in the foregoing portion of this memorandum some of the evidence which I find particularly persuasive, so I shall only highlight it here. T. Lomax taught people how to "cook" cocaine powder into "crack." He personally sold and delivered kilo quantities of "crack." He directed couriers to go to the West Coast, pick up powder cocaine, and return it to Omaha so that it could be "rocked up" into "crack."

Much more evidence not previously discussed also demonstrates T. Lomax's global involvement in this conspiracy. I shall not endeavor to discuss all of that evidence since it is voluminous, but I shall highlight some portions of it which I find particularly indicative of the ability to foresee the natural consequences of the conspiracy.

While he was returning to Omaha from the West Coast, T. Lomax's luggage was searched and a gun and a scale with cocaine residue were found inside. He also had a variety of pagers. T. Lomax engaged a women to obtain a mobile telephone for him in her name, and the last bill indicated that his phone charges were $1,500.00. Western Union records indicate that during the pertinent time frame, over $180,000 was transferred among members of the conspiracy, including $16,000 sent in the name of T. Lomax (or an alias) and $22,000 received by T. Lomax (or an alias). T. Lomax filed no tax returns, and had little or no income from lawful employment. Virtually every witness who admitted involvement in the sale of "crack" stated that he or she either dealt with T. Lomax directly or followed directions from others who were purportedly acting at the direction of T. Lomax.

In summary, T. Lomax had complete control over the conspiracy, and he exercised that control. The quantities of "crack" distributed by the conspiracy were reasonably

---

**25.** T. Lomax's involvement is described in detail in exhibits 3,000 through 3,041 and the trial exhibits referred to therein.

foreseeable by him, and the probation officer correctly attributed 12.6 kilos of cocaine base to T. Lomax.[26]

### 2.

■ While the evidence does not establish that S. Lomax was personally responsible for the distribution of over 5 kilos of "crack," it does establish that she should have reasonably foreseen that the conspiracy she joined would distribute substantial quantities of "crack" in furtherance of the conspiracy in an amount which would dictate a base offense level of 40.

Among other things, the evidence firmly proves with regard to S. Lomax that: (a) as previously described, she helped Fleming transport at least one pound of powder cocaine from California to Omaha, Nebraska; (b) as previously described, she sold 1½ kilos of crack to Thomas; (c) as earlier noted, the Thomas transactions with S. Lomax took place after T. Lomax had told Thomas to call a particular telephone number and if he (T. Lomax) was not available, another person would answer who would know "exactly" what Thomas wanted; (d) on one occasion S. Lomax told coconspirator Brooks to deliver half an ounce of "crack" to third parties and directed Brooks to a "safe house" were the "crack" was hidden in some bushes (Ex. 9,012: Tr. 158:8–162:2); (e) she transferred substantial sums of money (approximately $72,000 in her name or alias names) via Western Union, (Ex. 2,017; 2,016 and the following trial exhibits: 145; 84; 115–138;

158; 168–170; 221–223), although she had no consistent source of legitimate income,[27] and (f) she was at the Omaha, Nebraska, airport on October 25, 1989, to meet her cousin, T. Lomax, when he arrived with luggage that contained a gun and a scale with cocaine residue. (Ex. 3,020: Tr. 553–561 (and trial exhibit 58); Ex. 3,032: Tr. 810:17–812:12.)

The evidence thus establishes that S. Lomax was knowledgeable about and participated in virtually every important facet of this conspiracy. She assisted in transporting the "raw materials"—powder cocaine—from the West Coast to Omaha. She sold kilo quantities of the finished product—"crack"—when T. Lomax was unavailable. She directed at least one other person to sell "crack." She knew where the "crack" was hidden. She transferred sums of money (approximately $72,000) amounting to nearly six times the wholesale price of a kilo of "crack."[28] When the "boss" (T. Lomax) came to town with a gun and a scale, she went to the airport to meet him.

The amount of "crack" S. Lomax personally delivered to Thomas (1 and 1/2 kilos) and the amount she personally directed Brooks to deliver (half an ounce) are enough to impose a base offense level of 38 without attribution of "crack" sold by others. U.S.S.G. §§ 1B1.3(a)(1)(A) & 2D1.1(a)(3) & (c)(3). If one assumes the unremarkable proposition that the $72,000 or so transferred by S. Lomax amounted to the proceeds of sale of at least 4 kilos of "crack" (a generous esti-

---

**26.** Alternatively, I find that even if no amounts were attributed to T. Lomax from the sale of "crack" by others, his base offense level would have been the same under U.S.S.G. § 1B1.3(a)(1)(A). The testimony of Clifford Thomas (approximately 2¼ kilos) and Carl Johnson (about 6.8 kilos) establishes that T. Lomax personally distributed substantially more than 5 kilos of "crack" to these individuals alone.

**27.** It should be noted that S. Lomax "admits to sending Western Union transfers. However, [she contends] these transfers were all made for legitimate purposes." (PSR ¶¶ 33, 34, 35 & Addendum.) I find no persuasive evidence that the Western Union transfers were legitimate. For example, the PSR establishes without objection that as of October 26, 1992, S. Lomax had been receiving public assistance for four years. (PSR ¶ 71.) Moreover, the evidence at trial established that she had filed no tax returns. According to

the Superseding Indictment, the conspiracy existed from April, 1988, through November 30, 1991. S. Lomax provides no convincing explanation as to how she could lawfully have come into possession of $72,000 during this period of time, particularly when she was receiving public assistance and filing no tax returns. She claims that "most transfers were made on behalf of her cousin, Tracy Lomax and [an] uncle . . . for their family business and also for personal reasons." (PSR, Addendum.) However, there is no convincing explanation of why it was necessary to transfer money for her cousin or uncle, or how her cousin or uncle would have lawfully come into possession of that much cash.

**28.** Thomas testified that the wholesale price of the "crack" he bought from S. Lomax was between $12,000 and $12,500 a kilo. (Ex. 2,004: Tr. 284:1–13).

mate given Thomas's testimony that the wholesale value was about $12,000 a kilo), and adds to this figure the amount of "crack" which S. Lomax personally delivered or caused to be delivered, the total quantity of "crack" easily attributable to S. Lomax is over 5½ kilos. This quantity would require a finding of a base offense level of 40. U.S.S.G. § 2D1.1(a)(3) & (c)(2).

Further, since S. Lomax clearly would have known that the pound of powder cocaine she helped Fleming ship from California to Nebraska would be "rocked up" into at least one pound of "crack,"[29] the amount of "crack" easily attributable to S. Lomax is nearly 6 kilos (1 and 1/2 kilos (1500 grams) involving Thomas; half an ounce (14.17 grams) involving Brooks; at least 4 kilos (4,000 grams) represented by the transfer of $72,000; and one pound (453.6 grams) of cocaine powder involving Fleming which was intended for conversion to "crack"—a total of 5,967.77 grams). I therefore find that the minimum amount of "crack" S. Lomax is responsible for under the Guidelines is 5,967.77 grams, or 5.9 kilos.

### 3.

■ McMurray's case is much more troublesome. In fact, I find that the PSR is in error in attributing 12.6 kilos of "crack" to McMurray. Instead, I find that McMurray is responsible for no more than 468 grams of "crack," and that only because he either personally possessed the "crack" or because he drove a courier to Lomax's home and thereby aided and abetted a drug transaction. U.S.S.G. § 1B1.3(a)(1)(A). I do not believe the government has proved by the preponderance of the evidence that the remainder of the "crack" was "foreseeable" by McMurray under U.S.S.G. § 1B1.3(a)(1)(B).

Unlike T. Lomax and S. Lomax, McMurray was, according to the PSR, a "lackey" and a "crack addict" properly characterized as a "minor participant" under U.S.S.G. § 3B1.2(b), thereby warranting a two-level decrease in his Guideline calculation. (PSR ¶ 41.) According to Tracy Harris, one of T. Lomax's girlfriends, McMurray was "joined at the hip" with Lomax. (PSR ¶ 41.) In fact, the police report upon which this statement is based quotes Harris as stating:

> "that she had met Oscar MCMURRY [*sic* ], who she believed to be a brother or half brother to Tracy LOMAX, and who also goes by the name of 'BeeBee', while she was in Portland, Or. HARRIS stated that **she never saw Oscar MCMURRY with any money or drugs, however, Oscar MCMURRY would always run errands for Tracy LOMAX whenever he wished.**"

(Ex. 9,017, at 6–7.) (emphasis added)

While the PSR indicates that McMurray was "always in the company of Tracy Lomax," (PSR ¶ 41), it concludes that "there is no indication that the defendant had any decision making authority, nor did he control or direct the activities of others." (PSR ¶ 41.) The report emphasizes that "Tracy Lomax did not allow defendant to have large amounts of cocaine or cocaine base out of concern that defendant would consume it." (PSR ¶ 41.)

Neither the government nor McMurray objects to any of these characterizations.

■ The commentary to the Guidelines makes clear that simple knowledge by a relatively minor participant that the leader is distributing large drug quantities will not render the minor participant liable for the large quantities distributed by the leader. U.S.S.G. § 1B1.3(a)(1)(A) & (B), comment. (illustrations (c)(5) & (7)). The case law also makes clear that knowledge of the leader's large drug sales is not enough to establish

---

**29.** When cocaine powder is converted to "crack," the mass of the final product may be increased. Baking soda is commonly added to "crack": "This distinction is primarily important in the marketing of the drug because the addition of baking soda (or ammonia or other base) and diluents (from caffeine to PCP) to the cocaine during the refining process *actually adds mass to the final product*." M. Khalsa et al., Smoked Cocaine: Patterns of Use and Pulmonary Conse-quences, J. Psychoactive Drugs, Vol. 24(3), supra at 267 (emphasis added) (Ex. C22). In fact, Brooks, who testified that he "rocked up" a quarter of a kilo of cocaine powder for T. Lomax using baking soda and water boiled in a glass coffee pot, stated that from that quarter of a kilo he obtained "a little bit over 250 grams." (Ex. 4,001: Tr. 152:1–5.) Thus, the "1 to 1" ratio is accurate.

foreseeability. See, e.g., *United States v. Jones*, 965 F.2d at 1517 (where defendant only received a few rocks of "crack" as payment for his work and his work only involved the actual sale of .5 grams, the fact that defendant knew of his supplier's large-scale sales was not enough to make those sales "foreseeable").

 The government must establish that the minor participant knew or could reasonably foresee that the large-scale sales would be made in furtherance of the conspiracy the minor participant agreed to join. *Adipietro*, 983 F.2d at 1476; *Jones*, 965 F.2d at 1517; *United States v. North*, 900 F.2d 131, 133–34 (8th Cir.1990). Generally speaking, if a person is an "on-looker, 'gofer,' or guard" there is a lack of "foreseeability." *Adipietro*, 983 F.2d at 1476.

The evidence establishes that McMurray was T. Lomax's "gofer," who had limited insight into the operations of the conspiracy and therefore limited ability to foresee that his duties were part of a much larger criminal enterprise distributing up to 12.6 kilos of "crack." For example, the evidence does not establish that McMurray ever sold significant amounts of "crack." The evidence does not establish that McMurray ever personally had possession of large amounts of "crack." Indeed, with one exception noted below, the evidence does not even establish that McMurray saw large amounts of powder cocaine or "crack" cocaine. The evidence does not establish that McMurray ever transported large amounts of "crack." The evidence does not establish that McMurray ever "cooked" "crack." The evidence does not indicate that McMurray ever had large amounts of cash. As noted below, the evi-

dence is at best marginal as to whether McMurray sent or received any money from the conspiracy, but if he did, it was a relatively small amount. In short, the evidence does not establish that McMurray ever did or saw anything which would have made it "reasonably foreseeable" to a "lackey" that the conspiracy he joined was distributing 12.6 kilos of "crack." [30]

The government relies on three incidents to prove foreseeability: the New Tower Inn incident, the Brooks incident in Portland, and the Western Union transfers. However, I do not believe these incidents prove that McMurray could have reasonably "foreseen" the extent of his half brother's crack business.

McMurray was arrested with T. Lomax and his girlfriend Amber Allen at the New Tower Inn in Omaha, Nebraska, on October 11, 1988, after police received a tip from a hotel employee. (Exs. 5,001–5,004; 6,001–6,003.)

McMurray was registered in room 1210. T. Lomax and Amber Allen were staying in room 1074. When police officers entered room 1074, they found it occupied by T. Lomax, Amber Allen, and McMurray.

Ms. Allen testified at trial. She admitted T. Lomax gave her a gram of cocaine on that occasion and that she was in possession of glass tubes used "to cook the cocaine" into "crack." (Ex. 3,014: Tr. 429:5–430:4.) The cocaine and glass tubes were seized by the police, along with a rechargeable battery, a portable phone charger, and Western Union money transfers, totaling approximately $5,500, dated October 10 and October 11, 1988, in the names of T. Lomax, Oscar

---

30. This is not inconsistent with the jury verdict. The jury was not asked to make findings as to drug quantities. *Jones*, 965 F.2d at 1516 (remanding the case for resentencing, and holding that where a jury was not asked to specify what quantity of "crack" the defendant was guilty of conspiring to distribute, the district court was obligated to make that determination for sentencing purposes). Indeed, some commentators believe that sentencing liability is not coextensive with *Pinkerton* conspiratorial liability:

> The relevant conduct guideline underwent a massive "clarifying" overhead [sic] effective November 1, 1992. According to trainers at

the Sentencing Commission, the "clarification" was necessary to assist courts in applying the Guidelines in cases involving multiple defendants and in distinguishing various levels of culpability. The application notes now specify that the "principles and limits of sentencing accountability are not always the same as the principles and limits of criminal liability." This position seemingly overrules those circuits that found sentencing liability coextensive with *Pinkerton* conspiratorial liability.

Gerald T. McFadden et al., 1 Federal Sentencing Manual ¶ 4.02[1][b][ii], at 4–9 & 4–10 (1993) (footnotes and citations omitted).

McMurray, or Amber Allen. These items were all discovered in room 1074.

When McMurray was searched, the officers found less than half an ounce (14 grams) of "crack" packaged in 11 "baggies." The officers also found about $600 in cash on McMurray's person. Although he apparently at first tried to flee room 1074, McMurray gave the officers permission to search his room, No. 1210. McMurray also told the officers he had a gun in his room. The officers found a .38-caliber gun under the mattress in McMurray's room. When McMurray was strip searched at the police station, the officers found 350 milligrams of crack in his underpants.

This first incident proves nothing more than that McMurray was a "lackey" and perhaps a "guard" for T. Lomax. McMurray had a small amount of cocaine on his person. Like Allen, it is probable that McMurray received his cocaine from T. Lomax. McMurray had hidden a gun under his bed in another room. But the major implements of "crack" trafficking—the glass tubes, the money transfer records, the portable phone charger—were in the room where Lomax and his girlfriend were staying.

Second, the government points to a transaction which took place in Portland, Oregon. Although police were aware of McMurray and T. Lomax by virtue of their October, 1988, search of the New Tower Inn, the investigation of this case began in earnest when coconspirator Troy Brooks was arrested at the Omaha airport on May 24, 1991, with approximately one pound of powder cocaine. Troy Brooks quickly saw the value of cooperation.

Brooks testified at trial. (Ex. 4,001.) In essence, he testified that about a week prior to May 24, 1991, he received a call from T.

Lomax. Brooks was in Omaha, Nebraska, and T. Lomax apparently in Portland, Oregon. T. Lomax told him to fly to Los Angeles, pick up cocaine, and deliver the cocaine to Portland, Oregon. T. Lomax told Brooks that Floyd Russell would give him money for the flight, which he did.

Brooks flew to Los Angeles and picked up about a pound of powder cocaine at Amber Allen's residence. Allen confirmed this at trial. (Ex. 3,014.) In fact, Amber Allen testified that T. Lomax called her and told her Brooks would be coming and that "I was to meet with a guy to get the cocaine and have Troy take it back to Portland." (Ex. 3,014: Tr. 423:1–2.)

Brooks and Allen obtained the cocaine and stuffed it into a pillow. Brooks then traveled by bus to Portland. He went to T. Lomax's home and left the cocaine. Because T. Lomax wished to entertain a female friend in private that evening, McMurray drove Brooks to a hotel. McMurray stayed at the hotel with Brooks. The next morning, Brooks and McMurray returned to T. Lomax's residence. T. Lomax and Brooks weighed and repacked the cocaine in McMurray's presence. Brooks, wearing a blazer belonging to T. Lomax in order to hide the cocaine bulge, then flew back to Omaha, Nebraska, with instructions to contact Floyd Russell. Russell was to weigh the cocaine and call T. Lomax, whereupon Brooks would be paid $1,000.00.

Once again, although I believe McMurray is responsible for aiding and abetting this transaction in that he transported Brooks and watched Lomax and Brooks weigh and package the cocaine,[31] I do not believe this incident establishes that McMurray could reasonably have foreseen his half brother's other multikilo "crack" sales. All McMurray did during the Brooks incident

31. I think it appropriate to charge McMurray with one pound (453.6 grams) of "crack" even though the transaction involved only powder cocaine as the powder was seized prior to conversion. It is clear that the powder was intended for conversion to "crack" and McMurray knew the powder was intended for conversion to "crack" since it is undisputed that McMurray knew his half brother sold "crack." The fact that the powder was seized before it was converted to "crack" is not significant. The weight of

an incomplete distribution under negotiation is the weight to be counted so long as the seller has the intent to make the distribution and the reasonable capability of producing the negotiated amount. U.S.S.G. § 2D1.1, comment. (n. 12). See *Adipietro*, 983 F.2d at 1472. Alternatively, I do not think the seizure of the powder cocaine "reflect[s] the scale of the offense" unless the powder is treated as "crack." U.S.S.G. § 2D1.1, comment. (n. 12). *United States v. Garrido*, 995 F.2d 808, 811–12 n. 3 (8th Cir.1993).

was drive a car, sleep in the same hotel with Brooks, and watch Brooks and T. Lomax weigh and package cocaine. McMurray played no part in dealing with Brooks except as a "gofer" for T. Lomax. Indeed, the fact that McMurray had no place to sleep, other than with Brooks, while his half brother entertained is a sad testament to how little power, authority, and foresight McMurray actually had.

Third, the government contends that Oscar McMurray sent and received tens of thousands of dollars via Western Union during the period of the conspiracy. (Ex. 2017; 2016 and the following trial exhibits: 145; 115–138; 158; 168–170.) Specifically, the government contends that McMurray received more than $27,000 and sent more than $11,000. (PSR ¶ 30.) If this were true, it might establish that McMurray could reasonably have foreseen that the activities of the conspiracy would involve multikilo quantities of crack. Upon close examination, however, I find and conclude that the government's evidence is not convincing.

The government introduced evidence of about 257 Western Union transfers involving over $180,000. (Trial Ex. 158.) Of these 257 transactions, about 29 were sent in the name of Oscar McMurry. (Trial Ex. 123.) None were sent in the name of Oscar McMurray. Fifteen Western Union documents were received in the name McMurray. (Trial Ex. 129.) [32] Thirty-seven Western Union documents were received in the name of McMurry. (Trial Ex. 128.)

The defendant was indicted under the name Oscar McMurray. (Filing 157.) It should also be noted that the defendant's father is named Oscar McMurry, (PSR ¶ 56), and the defendant has sometimes used the last name McMurry. (PSR ¶ 56.) The defendant's father resides in Portland, Oregon, (PSR ¶ 56), and the two have a fairly good relationship. (PSR ¶ 56.) Indeed, the father testified at trial. (Filing 352.)

The government had some but not all of the Western Union records examined by a handwriting expert. The handwriting expert examined 32 documents involving the name McMurray or McMurry. Of those 32 documents, she determined that nine were not signed by the defendant. (Ex. 2,016: Tr. 966:6–8.) In fact, the handwriting expert testified that S. Lomax signed at least one document sent in the name of McMurry. (Ex. 2,016: Tr. 951:6–7; trial exhibit 158.) The handwriting expert could not examine the signatures on four of the documents because the copies were not clear. (Ex. 2,016: Tr. 965:24.)

With varying degrees of certainty, the handwriting expert linked 19 documents to the defendant. The handwriting expert was able to positively identify only 3 documents as being signed by the defendant. (Ex. 2016(A): [33] Tr: 964:3–22; WU: 4, 16 and 19). The handwriting expert was able to identify 16 documents it was either highly probable (8 documents) or probable (8 documents) the defendant had signed. (Ex. 2,016: Tr. 965:2–16; 966:9–18.) These documents were marked as trial exhibits WU: 23 (two documents), 39, 48, 49, 56, 134, 136, 137 (two documents) (highly probable); 35, 40, 132, 160, 161, 162, 163, 164 (probable).

Of these 19 documents, in only four instances allegedly involving money "sent" by the defendant could the Western Union documents be tied to him by handwriting comparison. These four instances involved only $2,250, (trial exhibits 123; WU: 4, 16, 134, 160), not the $11,000 claimed by the government in its submission to the probation officer.

With regard to money "received," at the very most the government was able to establish that defendant signed 15 documents, and received $5,900 in the name of McMurry, (trial exhibits 128; WU: 35, 132, 136, 137, 160, 161, 162, 163, 164), and $2,410 in the

---

32. Trial exhibit 129 is a summary of money sent to McMurray. However, it incorrectly lists trial exhibit WU134 as being received by McMurray when in fact it was received in the name of McMurry.

33. The government offered exhibit 2,016 into evidence. I have added pages 962–964 of the transcript as exhibit 2,016(A) because the defendant referred to those pages in his brief, incorrectly assuming that these pages were included in the original exhibit.

name of McMurray[34] (trial exhibits 129; WU: 19, 23, 39, 40, 48, 49, 56 and 134). Thus, based upon handwriting comparisons, the total this defendant received ($8,310) was less than one-third of what the government claimed (more than $27,000) in its submission to the probation officer. These amounts—$2,250 sent and $8,310 received—do not establish that McMurray would have known that his half brother was selling 12.6 kilos of cocaine.[35]

Moreover, given the fact that handwriting examination is an inexact science, as evidenced by the expert's equivocal opinions concerning 16 of the documents, there are serious questions about whether McMurray was involved with even these much smaller amounts. Two points should be made in this regard.

As indicated earlier, there was evidence that S. Lomax had forged McMurray's name on at least one Western Union document, and at least nine other documents bore McMurray's name but were not actually signed by him. This leads to the question of whether McMurray's name was being used by his coconspirators without his knowledge or agreement. Given the fact that McMurray was a "lackey" who was never seen by T. Lomax's girlfriend with money or drugs, it does not take much of an imagination to doubt that he actually signed some of the documents attributed to him.

In addition, there was evidence that McMurray's father, who lived in Portland, Oregon, used the same name as the defendant. The handwriting expert made no attempt to determine whether the defendant's father signed any of the documents attributed to his son. The defendant's father was also T. Lomax's stepfather, and T. Lomax told the probation officer that "he continues to enjoy a good relationship with his stepfather." (T. Lomax PSR ¶ 65.) S. Lomax also admitted to the probation officer that she made Western Union transfers to "my uncle

Oscar McMurray [*sic*] in Portland, Oregon." (S. Lomax PSR ¶ 33.) In fact, certain of the money transfers ostensibly in the defendant's name were ruled out by the handwriting expert as being received by the defendant even though the person receiving the money used the defendant's name and resided in Portland, Oregon. Compare Ex. 2016: Tr. 966:2–8 (WU 8, 24, 36, 58, 99, 101, 104, 39 [*sic* 139], 142) (documents not signed by defendant) with trial exhibit 128 (WU 8, 99, 139, 142) and trial exhibit 129 (WU 24, 36, 58, 101). Thus, there is good reason to believe that at least some of the money ostensibly received by the defendant was in fact received by his father.

Simply summarized, the Western Union transfers do not involve enough money to allow one to infer that McMurray would have been able to foresee that the conspiracy was dealing in multikilo quantities of "crack."

In conclusion, I find that McMurray is responsible for 468 grams of "crack"—14.35 grams in his possession at the New Tower Inn and 453.6 grams resulting from McMurray's transporting Brooks to T. Lomax so that one pound of powder cocaine could be transported to Omaha, Nebraska, and converted to "crack." U.S.S.G. § 1B1.3(a)(1)(A). However, I do not believe the government has proved by the preponderance of the evidence that the remainder of the "crack" was "foreseeable" by McMurray under U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, McMurray's base offense level should be reduced to 34. U.S.S.G. § 2D1.1(a)(3) & (c)(5).

### F.

■ McMurray argues that his base offense level should not have been increased two levels, (PSR ¶ 40), because of the gun found under the mattress in his hotel room at the New Tower Inn in October, 1988.[36] I disagree.

---

34. This includes one entry for an Oscar McMurry that was incorrectly included with the McMurray summary.

35. The total transfers amounted to $188,384. (Trial exhibit 158.) According to the handwrit-

ing expert, the amount sent *and* received by the defendant was only about 5.5% percent of the total.

36. The evidence reflects that ammunition was found with the gun, and McMurray does not contend otherwise.

The Guidelines provide for a two-level increase in the base offense level when a gun is possessed. U.S.S.G. § 2D1.1(b)(1). The commentary to the Guidelines states that the "adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with offense." U.S.S.G. § 2D1.1, comment. (n. 3).

As discussed earlier regarding the issue of "foreseeability," the gun was found in McMurray's room, but the other illicit activity on that day was taking place in T. Lomax's room. When he was confronted by police, McMurray was in T. Lomax's hotel room with T. Lomax and Amber Allen. Amber Allen was found to be in possession of cocaine. The officers located such things as glass tubing, Western Union money transfer documents, and phone accessories in T. Lomax's room. McMurray was found to be in possession of "crack."

I first observe that McMurray admitted to police that he had a gun in his hotel room. Therefore, there is no question that at the very least McMurray was in constructive, if not actual, possession of the gun. The question to be resolved is whether the gun "was present" and "connected with the offense" within the meaning of the Guidelines.

When confronted with the question of whether a weapon is "present" and "connected," one must first determine what the "offense" is. One of offenses here is conspiracy.

I believe McMurray was "present" in Nebraska, in Omaha, and at the hotel in October, 1988, for purposes of the conspiracy, and so was his gun. The offense—conspiracy—was not limited to any particular place, such as T. Lomax's hotel room. The fact that the gun was located in one room while McMurray was found in another does not detract from a finding that the gun was "present" for purposes of the conspiracy. Moreover, I do not think it is "clearly improbable" that the gun was connected with the conspiracy. On the contrary, I think it quite probable that McMurray brought the gun to Omaha as part of his duties as T. Lomax's "lackey," "gofer" or "guard."

Under the circumstances, I think the probation officer was correct in increasing McMurray's offense level as a result of the gun, even though the gun was located in McMurray's hotel room and most of the illicit activity on that day took place in T. Lomax's room. *United States v. Wiley,* 997 F.2d 378, 386 (8th Cir.1993) (court upheld enhancement where gun found in bedroom but transaction completed in living room); *United States v. Haren,* 952 F.2d 190, 198 (8th Cir.1991) (court upheld enhancement where guns were found in mobile home adjacent to sheds which served as the amphetamine labs); *United States v. Streeter,* 907 F.2d 781, 792 (8th Cir.1990) (court upheld enhancement where unloaded guns were found on ground floor and marijuana found in attic).

### G.

■■■ McMurray next argues that the probation officer erred when he failed to grant McMurray a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Essentially, McMurray argues that because he tried unsuccessfully on two occasions to plead "guilty" to the charges prior to trial, because his defense at trial was primarily that of insanity and diminished capacity, and because he truthfully admitted at trial and thereafter that he possessed 14 grams of "crack," he is entitled to the two-level reduction. I disagree.

■■■ It is a "rare" case when a defendant can put the government to the burden of a trial and still qualify for an "acceptance-of-responsibility" reduction. U.S.S.G. § 3E1.1, comment. (n. 2). However, a trial certainly does not foreclose a defendant from receiving an acceptance-of-responsibility reduction. *United States v. Charger,* 928 F.2d 818, 820–21 (8th Cir.1991) (remanding decision to refuse to award acceptance-of-responsibility reduction after jury trial resulted in conviction where it was unclear whether court rejected reduction because remorse lacked credibility or because of other impermissible factors). Those "rare" cases normally involve instances that "do not relate to factual guilt." U.S.S.G. § 3E1.1, comment. (n. 2).

■■■ On the day of trial, McMurray, at the urging of his very capable counsel, twice tried to enter a plea of "guilty" and avoid

trial. These pleas were styled *Alford* pleas. (Filing 330: Petition to Enter A Plea in Accordance with *Alford*.) [37] McMurray proposed, with the government's agreement, to enter a plea to a one-count Information charging him with conspiracy to distribute "crack" on the understanding that the other charges against him would be dismissed. The proposed plea reserved the right to appeal the court's refusal to suppress evidence regarding the New Tower Inn incident and further provided that McMurray could withdraw his plea if the base offense level was greater than 26. (Filing 330: Plea Agreement attached to Petition to Enter a Plea.) Counsel for McMurray stated that his client wished to enter an *Alford* plea because of his religious beliefs, which I understood precluded McMurray from admitting that a civil court had any authority over him. Twice on the day trial began, (Filing 313: Court Minutes), McMurray started to enter a plea, and twice he apparently became confused and uncertain and did not complete the process.[38]

At trial, McMurray's counsel indicated McMurray did not contest the government's evidence that he possessed 14 grams of "crack" at the New Tower Inn. McMurray also presented evidence on the defense of insanity and diminished capacity. Through his counsel, McMurray took the position that he had not stayed with Brooks on the occasion when Brooks, transporting powder cocaine, flew to Portland to meet with T. Lomax. McMurray's counsel argued both factual innocence and legal innocence (insanity and diminished capacity) to the jury. McMurray did not testify.

McMurray exercised his right not to speak with the probation officer, and instead relied on the letter his counsel provided to the probation officer. McMurray admitted through counsel possession of "crack" at the New Tower Inn for "personal use," but did not otherwise admit involvement in the conspiracy. (PSR ¶¶ 32, 33, 34.) His attorney argued to the probation officer that McMurray's involvement was a product of either his mental illness or a severe cocaine addiction, or both. (PSR ¶¶ 32, 33, 34.)

While I am sensitive to McMurray's religious beliefs, his mental illness, his right to go to trial without automatically forfeiting the reduction for acceptance of responsibility, and his right to communicate with the court and probation officer through his counsel, McMurray has never accepted responsibility within the meaning of the Guidelines. In coming to this conclusion, I have considered the pertinent factors outlined in the relevant application note to the Guidelines. U.S.S.G. § 3E1.1, comment. (n. 1 (a), (b), (d), (e), (g) and (h)).

First, aside from admitting possession of "crack" through his counsel, McMurray has not truthfully admitted the conduct comprising the offenses of conviction. For example, McMurray was convicted of conspiracy. Yet he has never admitted facts of his involvement in the conspiracy beyond the admission that he possessed "crack" at the New Tower Inn for "personal use." I do not believe that McMurray's only involvement in the conspiracy was possessing 14 grams of "crack" for personal use in Omaha, Nebraska, in 1988. McMurray could have and should have explained his involvement with T. Lomax and Amber Allen at the New Tower Inn, particularly the nature of the conspiratorial agreement between McMurray and T. Lomax.

Second, there is no evidence that McMurray voluntarily terminated or withdrew from the conspiracy. There is no evidence that he voluntarily surrendered to authorities promptly after the offenses. There is no evidence that McMurray provided voluntary assistance to the authorities respecting the recovery of the fruits (money) and instrumentalities (such as "crack") of the offenses.

---

**37.** If the court determines there is a factual basis, it may accept a guilty plea even where the defendant claims his innocence so long as the plea is otherwise knowing, intelligent, and voluntary. *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970).

**38.** While I believe McMurray was "confused," I do not believe such confusion was a product of his mental illness. On the day trial commenced (May 4, 1993), I satisfied myself through the United States Marshal that McMurray had been receiving and taking his medication regularly. He had been in the custody of the Marshal since March 23, 1993.

Third, while substantial efforts have been made to provide him with drug treatment since his arrest (including three inpatient admissions), McMurray has not successfully completed such treatment. (PSR ¶ 67.) Moreover, to the extent that his addictions have interfered with his ability to accept responsibility, to a significant degree McMurray's own refusal to accept help has been the cause of his inability to accept responsibility.

In a similar vein, McMurray has been receiving and taking lithium since late March, 1993, when he was finally placed in the custody of the United States Marshal. As noted earlier, the court specifically questioned a deputy United States Marshal on the first day of trial to insure that McMurray was receiving and taking his lithium. Accordingly, it is doubtful that McMurray's mental illness has played a significant part in precluding him from fully accepting responsibility, and notwithstanding the administration of his medication, McMurray has not been forthcoming.[39]

Finally, McMurray's conduct said to evidence acceptance of responsibility came very late. His aborted pleas took place the day trial began. In fact, jury selection was delayed in an effort to accommodate him. Thereafter, McMurray maintained an essentially defensive posture regarding the issue of acceptance of responsibility—attacking the PSR but not providing positive evidence of acceptance of responsibility for the conduct comprising the offenses of conviction.

### H.

 McMurray contends that I should depart downward under U.S.S.G. § 5K2.13, p.s., due to his diminished capacity. I agree.

### 1.

U.S.S.G. § 5K2.13, p.s., provides that:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

 The diminished capacity of the defendant need not be the only factor which causes the commission of the crime in order for the court to depart downward under this section of the Guidelines. *United States v. Ruklick,* 919 F.2d 95, 97 (8th Cir.1990) (remanding case for reconsideration after conviction for distribution of LSD, holding that the mental illness need not be the "but-for" cause of the offense). However, if the court departs downward under U.S.S.G. § 5K2.13, p.s., the court may not sentence below the statutory minimum without a motion from the government. *United States v. Rudolph,* 970 F.2d 467, 470 (8th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1023, 122 L.Ed.2d 169 (1993).

Both the defense psychiatrist (who was also a treating physician) and the psychiatrist appointed upon the motion of the government[40] agreed that McMurray now suffers and suffered during the period of the conspiracy from the major mental illness known as "bipolar disorder."[41] (Ex. 6,006: Tr. 1,148:6–10; Ex. 7,007: Tr. 1,042:17–22.) In fact, the court-appointed psychiatrist found objective evidence of the mental illness when he administered the Minnesota Multiphasic Personality Inventory (MMPI). The doctor reported that: "The 8–9 scales were significantly elevated and indicative of his past

---

**39.** As a corollary to this argument, McMurray's lawyer argues that his client was being pressured by his codefendants and perhaps others to "hang tough." While I do not discount this concern, McMurray was represented by an experienced, capable, and zealous lawyer who provided him with numerous opportunities outside the presence of his codefendants to accept responsibility.

**40.** See Fed.R.Crim.P. 12.2(c).

**41.** Both doctors testified at trial regarding the issue of insanity or diminished capacity. The defense psychiatrist supported the position that McMurray was insane or suffered from diminished capacity, and the psychiatrist appointed by the court upon the government's motion believed McMurray was sane and not suffering from diminished capacity. Neither doctor was called to testify at the sentencing hearing.

experience of manic symptomatology associated with delusions." (Attach. Filing 123, Psychiatric Evaluation at 4.) Like the defense psychiatrist, the psychiatrist appointed by the court recommended that McMurray be "reinstated on prophylactic Lithium Carbonate to protect against further exacerbation of mania." (*Id.*)

A "bipolar disorder" is characterized by manic episodes. (Ex. 7,002: Diagnostic and Statistical Manual of Mental Disorders (Third Edition Revised) (DSM–III–R) at 214.) These manic episodes are characterized by elevated, expansive, or irritable moods and "are sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to require hospitalization to prevent harm to self or others." (*Id.*) The "elevated mood may be described as euphoric, unusually good, cheerful, or high, often having an infectious quality for the uninvolved observer, but recognized as excessive by those who know the person well." (*Id.* at 215.) The "elevated mood" may also turn angry: "Another common associated feature is liability of mood, with rapid shifts to anger or depression." (*Id.* at 216.) "Frequently the person does not recognize that he or she is ill and resists all efforts" at treatment. (*Id.*)

These episodes begin suddenly, and last from a few days to months. (*Id.*) There is often a need for involuntary hospitalization because of the poor judgment exhibited by the person during these periods of time. (*Id.*) The "most common complications of a Manic Episode are Psychoactive Substance Abuse and the consequences of actions resulting from impaired judgment, such as financial losses and illegal activities." (*Id.*)

**2.**

McMurray was hospitalized in Oregon for his mental illness on three occasions.

He was first hospitalized on January 7, 1988, with psychotic symptoms including hallucinations, grandiosity, and religious delusions. (Attach. Filing 123, Psychiatric Eval-

uation at 2.) He was discharged on January 19, 1988, against medical advice. (*Id.*) At that time, his doctor diagnosed him as suffering from bipolar affective disorder as well as drug and alcohol abuse, but since the patient did not agree with the diagnosis, no lithium was prescribed. (*Id.*)

McMurray was rehospitalized on February 9, 1988, under similar circumstances, and discharged on February 16, 1988, when his condition improved. (*Id.;* Court's Ex. 1: Test. Dr. Harrison: Tr. 1,047:11–12.) [42] During this hospitalization (February, 1988), McMurray was taking lithium by prescription. (*Id.*) He told the court-appointed psychiatrist that he continued to take lithium for about a year afterward, (*id.*), but then refused to take the medication any longer. (*Id.* at 4.)

Because McMurray's third and last hospitalization is critical in my opinion, I shall discuss it in greater detail.

Dr. Howard Harrison, a board-certified psychiatrist, treated McMurray each time he was admitted to the hospital in Oregon. Dr. Harrison described McMurray's third hospitalization and the events leading up to it as follows.

McMurray arrived at the hospital where Dr. Harrison practiced at about 4:00 a.m. on March 20, 1991, looking for Dr. Harrison and requesting treatment for his mental illness. (Court's Ex. 1: Test. Dr. Harrison: Tr. 1,051:19–25.) Because McMurray's health insurance had changed providers, the emergency room doctor told him to go to another hospital. (*Id.*) When McMurray insisted that he wanted to see Dr. Harrison, the emergency room doctor issued a prescription for lithium and told McMurray to see Dr. Harrison at a later time. (*Id.*)

The next time McMurray was seen at the hospital was May 14, 1991. (*Id.:* Tr. 1,052:11.) McMurray was brought to the hospital by family members at 4:00 a.m. in a "very agitated" state. (*Id.:* Tr. 1,052:18.) He was placed in restraints, and hospitalized in the psychiatric intensive care unit by the

**42.** Although the parties supplied me with portions of the transcript of Dr. Harrison's trial testimony, I found it appropriate to examine the entire transcript. Accordingly, I have marked Dr. Harrison's testimony as court's exhibit 1.

emergency room doctor. (*Id.:* Tr. 1,052:19–20.) The emergency room doctor placed a "legal hold" on McMurray. (*Id.:* Tr. 1,054:6–7.) The intensive care unit has video monitors, a nurse for every two patients, and is "behind three different locked doors." (*Id.:* Tr. 1,052:22–25.)

When Dr. Harrison first examined him on May 14, 1991, McMurray was heavily medicated and "could not or would not wake up to answer my questions." (*Id.:* Tr. 1,053:10–11.) Laboratory tests determined that there was marijuana in McMurray's system, but no other drugs. (*Id.:* Tr. 1,053:15–16.) Later, McMurray was more responsive and told Harrison, "I'm so confused, I think I'm hallucinating." (*Id.:* Tr. 1,055:2–5.) McMurray stated he was unable to remember how he got to the hospital, complaining that "it was like a bad dream." (*Id.:* Tr. 1,055:12–15.) McMurray was paranoid, indicating there was some threat from the other patients. (*Id.:* Tr. 1,055:11–12.) At times McMurray would refuse medication, and at other times, he would accept it. (*Id.:* Tr. 1,055:4–6.)

Dr. Harrison came to the conclusion that "his illness was out of control" and that McMurray would need a lengthy hospital stay, "weeks to maybe months, to help him back to control." (*Id.:* Tr. 1,054:2–4.) Harrison was considering a formal commitment under Oregon law "because he was so ill, and I thought he needed longer term treatment, and the only way to get a patient into the state hospital system in Oregon is to have them committed." (*Id.:* Tr. 1,054:20–25.)

However, McMurray wanted to leave the hospital so he could be home on his birthday.[43] (*Id.:* Tr. 1,058:5–6.) Unfortunately for McMurray, he was released on May 15, 1991. (*Id.:* Tr. 1,057:15–25.) McMurray had been confined at the hospital under a provision of Oregon law that allowed a patient to be held involuntarily when two doctors agreed, but only until a "court investigator" could determine whether a continued hold was necessary. (*Id.*)

Apparently without the agreement of Dr. Harrison, the court investigator "for reasons that are not apparent to me even now" released the hold, even though McMurray was "still showing considerable symptomatology and considerable denial about his illness." (*Id.:* Tr. 1,057:15–1,058:2.) Accordingly, the hospital released McMurray. Harrison did not see McMurray again until after these legal proceedings began.

The court-appointed psychiatrist reviewed the hospital records regarding this third hospitalization. Among other things, those records indicate that on May 14, 1991, McMurray's lithium level was subtherapeutic at 0.38. (Attach. Filing 123, Psychiatric Evaluation at 3.) The records also indicate that the next day "[McMurray] was discharged with instructions to continue taking Lithium as prescribed and to follow up at [a mental health clinic]." (*Id.*) The court-appointed psychiatrist observed that there were no other medical records available to him for the period of time between May 15 and July 1, 1991, and McMurray stated that he did not recall whether he took the lithium or followed up at the clinic. (*Id.*)

**3.**

I am in full agreement with the government and the court-appointed psychiatrist that McMurray's acknowledged mental illness cannot totally absolve him of his criminal conduct. The jury was asked to consider McMurray's mental health claims, and the jury rejected them.

I am in further agreement with the government and the court-appointed psychiatrist that for most of the time it would be mere speculation to conclude that McMurray's criminal conduct can be attributed to his mental illness for sentencing purposes. However, I believe that for a short period of time from May 14, 1991, through at least May 24, 1991, it is quite likely that McMurray's mental illness was active, pronounced, untreated, and at least partially the cause of his criminal activity during that period of time.

As noted earlier, McMurray transported Brooks to a meeting with T. Lomax in Portland on about May 24, 1991, at which time he saw Brooks and T. Lomax repackage cocaine and place it on Brook's person for transpor-

---

**43.** According to his PSR, McMurray was born on May 17. (PSR at 2 (Identifying Data).)

tation to Omaha, Nebraska. (Ex. 4,001.) The night before that, McMurray had stayed with Brooks because T. Lomax wanted to entertain a female friend. I have heretofore found that his aid to Brooks and T. Lomax renders McMurray responsible under the Guidelines for the quantity of cocaine those individuals dealt with on that occasion.

The difficult question is whether McMurray's mental illness, which obviously flared up on May 14, 1991, would have impacted his judgment when Brooks was dealing with McMurray and T. Lomax about ten days later. I think it probable that mental illness did impact McMurray's judgment. Since the illness need not be the only cause of the illegal conduct, I conclude that McMurray is entitled to a downward departure to the extent that the Portland incident may have increased his guideline sentence. I come to this conclusion for the following reasons.

First, the "most common complications of a Manic Episode are Psychoactive Substance Abuse and the consequences of actions resulting from impaired judgment, such as financial losses and illegal activities." (Ex. 7,002: DSM–III–R at 216.) This results from the impact of the disease on judgment: "Characteristically, there is inflated self-esteem, ranging from uncritical self-confidence to marked grandiosity." (*Id.* at 215.) This impairment frequently leads to "excessive involvement in pleasurable activities which have a high potential for painful consequences that the person often does not recognize." (*Id.* (emphasis added)). The court-appointed psychiatrist agreed that if McMurray was having a manic episode, "his culpability was diminished." (Attach. Filing 123, Psychiatric Evaluation at 5.) Therefore, the question is not whether McMurray's disease has the capacity to significantly impair his judgment, but rather whether he was suffering from a manic episode when he was dealing with Brooks and T. Lomax.

Second, I think it likely that McMurray was actively manic from the time of his release on May 15, 1991, at least through his dealings with Brooks about ten days later. The following evidence is significant.

Dr. Harrison, the treating physician, testified that it was his impression on May 14, 1991, that McMurray was going to need at least "weeks" and perhaps "months" of inpatient treatment. It is not unusual for these manic episodes to "last from a few days to months." (Ex. 7,002: DSM–III–R at 216.) Indeed, in the past, McMurray's stay at the hospital had involved at least seven days of treatment when he was receiving lithium. During his first hospitalization, when he did not receive lithium, he was discharged against medical advice after about twelve days.

In May, 1991, at the time he was released from the Oregon hospital, McMurray's lithium level was below therapeutic levels. It is not uncommon for persons with this disorder to refuse medication when they are manic. (Ex. 6,007: Letter from Court–Appointed Psychiatrist of 8/12/93.) McMurray manifested this drug-refusal behavior when dealing with Dr. Harrison in May, 1991.

There is strong reason to believe that McMurray was manic when released on May 15, 1991, and functioning during this period of time without adequate medication. It is therefore likely that he was suffering from impaired judgment during his dealings with Brooks and T. Lomax.

Third, I am not satisfied that the trial testimony of either the court-appointed psychiatrist or Brooks should be accorded significant weight regarding the ten-day period of time following McMurray's release from the hospital. My reasoning in this regard is as follows.

The court-appointed psychiatrist, (Exs. 6,005 & 6,006), based his opinion that McMurray was not suffering from a manic episode during this period primarily on three factors: (1) McMurray professed no recollection of events; (2) no one observed McMurray acting as though he were suffering from mental illness during this time; and (3) McMurray likely would not have been released from the hospital if he had been actively manic. I am not persuaded by any of these points.

The fact that McMurray professed no recollection of events is not inconsistent with the disease and the available evidence of McMurray's behavior. McMurray told Dr. Harrison

in the hospital that he was having difficulty remembering what had happened to him. This statement was made to Harrison at a time when McMurray had no reason to lie. Dr. Harrison testified that such difficulties with memory are not inconsistent with mania. (Court's Ex. 1: Test. Dr. Harrison: Tr. 1,056:2–25.) Indeed, "[c]atatonic symptoms, such as stupor" are an associated feature of the disease. (Ex. 7,002: DSM–III–R at 216.)

But even if McMurray was lying to the court-appointed psychiatrist, such conduct would not be inconsistent with the claim that he was suffering from mania in May, 1991. When McMurray was interviewed by the court-appointed psychiatrist more than a year later, he was aware of the reason for the examination. Thus, he had reason to overstate the impact of his disease. Even assuming that McMurray could in fact recall what happened in May, 1991, such a recollection would not disprove mania and its consequent impairment in judgment, particularly given Dr. Harrison's testimony about McMurray's hospitalization on May 14–15, 1991.

The court-appointed psychiatrist also believed that since no one observed McMurray acting in a manner consistent with mania on or about May 24, 1991, he probably was not manic. Although Brooks testified that McMurray did not look or act strangely, the nature of McMurray's illness is such that an encounter with him might appear quite pleasant to the "uninvolved observer" who did not "know the person well." (Ex. 7,002: DSM–III–R at 215.) There is no claim that Brooks was well acquainted with McMurray. Thus, Brooks's testimony is not persuasive. T. Lomax, the only other observer who knew McMurray well, did not testify. While the absence of testimony from an observer who knew McMurray or who was trained to recognize mental illness is a factor to be considered, it is certainly not dispositive.

The court-appointed psychiatrist was also persuaded that McMurray was not suffering from mania upon his release from the hospital because he doubted McMurray would have been discharged under those circum-

stances. It is noteworthy, however, that the court-appointed psychiatrist did not consult with Dr. Harrison, but instead relied on the medical record. (Ex. 6,006: Tr. 1,148:9–12.)

The medical records were not offered into evidence. Although the court-appointed psychiatrist believed that a discharge note on May 15, 1991,[44] indicated McMurray was not suffering from delusions, (Ex. 6,005: Tr. 1,132:18–23), the psychiatrist also recalled that Dr. Harrison had made a progress note on May 15, 1991, that "there is no way this patient can be discharged over the next few days." (Ex. 6,006: Tr. 1,148:18–25.)

In any event, the court-appointed psychiatrist was obviously unaware of Dr. Harrison's strong feelings about McMurray's mental illness, the need for further treatment, and the doctor's consternation at McMurray's release, primarily because the court-appointed psychiatrist did not talk with Harrison but relied only on the medical records. Specifically, the court-appointed psychiatrist admitted he was not aware that McMurray was released by a "court investigator" and not Dr. Harrison. (Ex. 6,606: Tr. 1,149:1–5.) Under these circumstances, the court-appointed psychiatrist's view that the hospital would not have released McMurray if he were suffering from mania is not persuasive.

■ Fourth, and finally, I do not believe McMurray's voluntary ingestion of drugs disqualifies him from receiving the benefits of a downward departure. While it is true that McMurray was a cocaine addict, and the evidence indicates that he had ingested marijuana at the time of his hospitalization in May, 1991, there is no evidence that McMurray's drug problems were the only cause of his criminal conduct. Both doctors acknowledged the drug problem, but both also diagnosed McMurray as suffering from a discrete mental illness. Drug abuse is often a product of this type of mental illness. (Ex. 7,002: DSM–III–R at 216.) Therefore, one cannot honestly deny McMurray a downward departure under U.S.S.G. § 5K2.13, p.s., because of "voluntary use of drugs."

44. The author was not identified.

**4.**

Having found that McMurray is entitled to a downward departure, there remains the question of the extent of that departure. I believe counsel should be given an opportunity to advise me on this issue, and, accordingly, I shall hear counsel's arguments in this regard at sentencing.

**I.**

S. Lomax argues that the evidence was insufficient to establish that she was a "leader" or "organizer" under U.S.S.G. § 3B1.1(a).[45] Accordingly, she argues that the PSR is incorrect and that her 4–level enhancement was improper. (PSR ¶ 4.) I agree, but I believe a 3–level enhancement is appropriate under U.S.S.G. § 3B1.1(b).

I think it clear that T. Lomax was both the "leader" and "organizer" of this conspiracy. While I recognize that there can be more than one leader and organizer, U.S.S.G. § 3B1.1, comment. (n. 3), I do not think S. Lomax was either a leader or an organizer.

There is no evidence that S. Lomax organized this conspiracy. As to whether she was a "leader," I believe the evidence, particularly the testimony of Clifford Thomas, establishes that S. Lomax took a subordinate position to T. Lomax.

However, I find that S. Lomax was a "manager." As previously indicated, she assisted in the transportation of the "raw materials"—powder cocaine—from the West Coast to Omaha. She sold kilo quantities of the finished product—"crack"—when T. Lomax was unavailable. She directed at least one other person to sell "crack." She knew where the "crack" was hidden. She transferred sums of money (approximately $72,000) amounting to nearly six times the wholesale price of a kilo of "crack."

Accordingly, I find that S. Lomax should be classified as a "manager" under U.S.S.G. § 3B1.1(b), but not a "leader/organizer" under U.S.S.G. § 3B1.1(a). As a result, her total offense level must be reduced to 43.

**III.**

Insofar as T. Lomax and S. Lomax are concerned, the probable result of this opinion is that these two young people will be sentenced to life in prison. For whatever value it may have, it is my strongly felt opinion that neither T. Lomax nor S. Lomax ought to spend the rest of their days in prison. However, I have not yet found a principled basis for imposing a lesser sentence under the Guidelines. Although the Guidelines are not as inflexible as some think, *United States v. Rivera*, 994 F.2d 942 (1st Cir.1993), they are not elastic either. *United States v. Groene*, 998 F.2d 604 (8th Cir.1993). Since my disagreement with these sentences is with many of the normative values underlying them, I am justified only in voicing that disagreement.

Accordingly,

IT IS ORDERED that:

(1) Defendant T. Lomax's objections to his presentence report (Filing 388) are denied;

(2) Defendant S. Lomax's objections to her presentence report (Filing 372) are denied, with the exception that the court finds that her role in the offense was that of a "manager," not a "leader/organizer," and thus her total offense level should be 43, with a criminal history category of I.

(3) Defendant McMurray's objections to his presentence report (Filing 381) and motions (Filings 409 and 435) are denied, with the exception that the court finds that: (a) McMurray's proper criminal history category is II, (b) the amount of "crack" attributable to McMurray is 468 grams, (c) the motions for downward departure (Filings 409 and 435) should be granted in part under U.S.S.G. § 5K2.13, and thus McMurray's total offense level, before departure, is 34, with a criminal history category of II.

---

**45.** There is no question that this conspiracy involved five or more participants. For example, the government clearly proved at trial that T. Lomax, S. Lomax, McMurray, Russell, Brooks, and Fleming were involved in the conspiracy.