**UNITED STATES of America, Plaintiff,**

v.

**Jacqueline M. FOLLETTE, Defendant.**

**No. 4:97CR3011.**

United States District Court,
D. Nebraska.

Jan. 20, 1998.

Alan Everett, Asst. U.S. Atty., Lincoln, NE, for Plaintiff.

Clarence E. Mock, Johnson and Mock, Oakland, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Jacqueline M. Follette (Follette) is a young deaf woman with no criminal history. She also has a serious mental disorder. For sentencing purposes, she requests (filing 21) that I depart downward pursuant to U.S.S.G. § 5K2.13, p.s. (diminished capacity). Alternatively, she seeks departure under U.S.S.G. § 5K2.0, p.s. (circumstances of a kind or degree not adequately considered by the Sentencing Commission). By a plea of guilty, Follette admitted to being an accessory after the fact to a bank robbery by helping the robbers avoid apprehension. *See* 18 U.S.C. § 3.

I will grant the motion based upon Follette's significantly diminished mental capacity pursuant to U.S.S.G. § 5K2.13. I will depart downward and impose a probationary sentence. Because I have granted the defendant's motion pursuant to section 5K2.13, reaching Follette's alternative motion to depart under section 5K2.0 is both unnecessary and inadvisable.[1]

To understand my decision, it is necessary to discuss the facts, departure law as applied to the facts, and the basis for the extent of my departure. I turn to those matters next.

---

1. Whether the court can consider diminished capacity as *one of a number of related factors* under section 5K2.0 appears to present a question of first impression in this circuit. *Compare United States v. Dillard*, 975 F.2d 1554, 1555 (8th Cir. 1992) (where lone reason for departure was diminished capacity, Sentencing Commission's consideration of diminished capacity under section 5K2.13 precluded consideration of diminished capacity under section 5K2.0), *cert. denied*, 507 U.S. 962, 113 S.Ct. 1389, 122 L.Ed.2d 764 (1993). Therefore, jurisprudential considerations counsel against reaching that issue unless it is necessary to do so. Since I have decided that the extent of the departure would be the same if I granted either motion, Follette is not prejudiced by my failure to decide alternative motion.

## I. Facts

The facts come from the presentence report (PSR), the deposition of Bruce D. Gutnik, M.D., (Def.'s Ex. A) and a written psychiatric evaluation by Dr. Gutnik (Dep.Ex. 2). Additional medical information comes from the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (DSM IV) and the *Physicians' Desk Reference* (51st ed. 1997) (PDR). Summarized, the facts are as follows.

### A. Mental Problems Before the Crime

Follette was born on January 9, 1978, in Norfolk, Nebraska. When Follette was three, she contracted spinal meningitis. Because of this illness, Follette became deaf in her left ear, and the hearing in her right ear is poor. To understand the spoken word, Follette must read lips, but she suffers migraine headaches from doing so. She has also had asthma all her life.

When Follette was three or four years old, her parents divorced. After the divorce, Follette lived with her mother, with whom she was very close. Her mother remarried, but Follette did not like her stepfather. When Follette was 13, her mother died. After the death of her mother in 1991, Follette was in the custody of the Nebraska Department of Social Services from 1992 through 1996.

Shortly after her mother died, Follette attempted suicide by swallowing nine over-the-counter pain tablets. She was 14 years old at the time. Follette stated that she feared being forced to reside with her biological father because he was an alcoholic. Her father is in fact an alcoholic, but he has been sober since about the time Follette attempted suicide.

Because of the suicide attempt, Follette was placed in a psychiatric hospital for 30 days. Following her hospitalization, Follette was placed with foster parents for one year. During this time, she saw two mental health professionals.

At age 15, Follette began to live with her biological father. She had difficulty adjusting to her school and her father. After completing the eleventh grade, Follette was expelled for poor attendance and a bad attitude toward the principal. She was also placed in a shelter for four days when she apparently left the home of her father.

Shortly after she turned 17, Follette was hospitalized in Norfolk, Nebraska, for stab wounds in her neck, shoulder, and thumb. The wounds required stitches. Although Follette reported that a man attacked her, the police and the doctors suspected that her wounds were self-inflicted.

Because of this suspicion, Follette was hospitalized at two places in Omaha, Nebraska. She was first seen at the University of Nebraska Medical Center. Testing at the Medical Center on February 8, 1995, revealed that Follette had a verbal I.Q. of 85, a performance I.Q. of 122, and a full scale I.Q. of 100. Follette's low verbal I.Q. was attributed to Follette's hearing impairment.

The Minnesota Multiphasic Personality Inventory also revealed a narcissistic personality and possible manic symptoms. The diagnostic impression of the Medical Center was "consider Bipolar Disorder mixed type, manic phase, and Adjustment Disorder with disturbance of conduct." This tentative impression was prepared by a person holding a master's degree.

Shortly after that, and evidently because of the testing at the Medical Center, Follette was hospitalized at the St. Joseph Center for Mental Health. Dr. Mark Dierks, a psychiatrist, saw her. When Follette was discharged on February 22, 1995, she was diagnosed with a Bipolar Disorder (mixed) with possible Posttraumatic Stress Disorder.

People with Bipolar disorder are seriously mentally ill.[2] "Bipolar disorder" is often called manic depression. These patients frequently have difficulty conforming their conduct to the law because the unrealistic and extreme moods that characterize the illness seriously impair their judgment.[3]

---

**2.** *See* DSM IV at 350–363. *See also United States v. McMurray*, 833 F.Supp. 1454, 1480–84 (D.Neb.1993) (court would depart downward under U.S.S.G. § 5K2.13 where defendant had been hospitalized on three occasions for "bipolar disorder," and defendant was released ten days prior to drug offense when his lithium levels were sub-therapeutic), *aff'd* 34 F.3d 1405 (8th Cir.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995).

**3.** *See McMurray, supra* note 2.

At discharge, her Global Assessment of Functioning Scale score (GAF) was 15.[4] A GAF score of 15 is very low and shows a serious problem with psychological, social, and occupational functioning.[5] People with GAF scores of 15 are often in danger of hurting themselves and frequently show signs of manic excitement.[6] They also can be largely incoherent.[7]

When she left the hospital, Follette was prescribed 675 milligrams of Eskalith three times per day. The generic name for Eskalith is lithium carbonate.[8] This medication is used for the treatment of manic episodes.[9] The drug is also used as a "maintenance therapy" because it prevents or diminishes subsequent manic episodes.[10]

People who need lithium frequently show one or more of the following symptoms: pressure of speech, motor hyperactivity, reduced need for sleep, flight of ideas, grandiosity, elation, poor judgment, aggressiveness, and possible hostility.[11] Follette's discharge dosage was consistent with the recommended dosage for a person suffering from acute mania.[12]

After her discharge from the hospital, Follette was placed at the Boys and Girls Home Shelter and resided there until April 6, 1995. From April 6, 1995, until December 22, 1995, she was placed at the Uta–Hallee Girls Village. From December 22, 1995, until the present, Follette has lived with her father, with the exception of four months when she resided with friends.

In January of 1996, Follette was evaluated as an outpatient by Behavioral Health Specialists. The details of the evaluation are unknown, but generally the evaluation noted that she had made positive strides emotionally. Although it is not entirely clear, it is likely that Follette was taking lithium in January of 1996 when this evaluation was completed. Indeed, Follette told Dr. Gutnik[13] that when she took her lithium, it helped her.

She also told Gutnik that she took the medication for about a year after they released her from the hospital in February of 1995. Later she stopped taking the drug. As a result, Follette's last lithium use was apparently in the Spring of 1996 if her recollection is correct about how long she took the drug.

She also told Gutnik that she stopped using lithium upon the advice of her physician because she had become pregnant. According to the PDR, pregnant women should be advised that taking lithium during pregnancy may cause fetal abnormality.[14] Follette did, indeed, become pregnant.

She became pregnant from a relationship with Erick Varela (Varela). Follette gave birth to this child in June of 1997. Although it is uncertain when she became pregnant, it is likely, given a normal gestation period, that Follette was pregnant in late 1996.

Despite the relationship with Varela, Follette married Ramiro Garcia (Garcia) on February 10, 1997. Follette was 19 at the time of her marriage to Garcia. Follette told Dr. Gutnik that she married Garcia, an illegal alien, at the request of Varela. The purpose of the marriage was to help Garcia stay in the United States.

### B. Accessory After the Fact

On February 26, 1997, Varela and Jesus Marmolejo (Marmolejo) robbed the Farmers State Bank in Humphrey, Nebraska. Varela was armed with a shotgun.

---

4. *See* DSM–IV at 32 (code 11–20).

5. In increments of 1 to 100, GAF scores range from a high of 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or persistent inability to maintain hygiene, or serious suicidal act with clear expectation of death). *Id.*

6. *Id.*

7. *Id.*

8. *See* PDR at 2658–2660.

9. *Id.* at 2659.

10. *Id.*

11. *Id.*

12. *Id.* at 2660.

13. As will be discussed later, Gutnik evaluated Follette after the crime had been committed.

14. *See* PDR at 2659.

Earlier that morning Varela, Marmolejo, Follette, and Heather Rupp (Rupp) drove to a parking lot where the men stole a car. The four young people then separated. The men went to the bank in the stolen car. Rupp and Follette drove to a prearranged spot in Follette's car. Rupp drove.

At the bank, Varela told everyone in the bank to get down on the floor. With Varela guarding the bank employees with the gun, Marmolejo went to the vault and took $28,-000.00. After that, the men fled the bank in the stolen car. They harmed no one at the bank.

They drove to a spot where Rupp and Follette waited in Follette's car. With Follette's help, the two men got into the trunk of the car. The shotgun was also placed in the trunk, where it remained for two weeks. With Rupp driving, the four went to a store so the men could buy new shoes. Later, they drove to Rupp's home.

They paid Rupp $2,000.00 for her help. They divided the balance of the money. Varela and Follette took one share of the money and Marmolejo took another share. Varela and Follette received the largest portion. Follette claims, and there is no evidence to the contrary, that Varela did not share that money with her. Follette does admit, however, that Varela gave her food and other items that they purchased with the stolen money.

Before the robbery, Varela told Follette that Marmolejo and he were planning to rob the bank. Initially, she did not believe the men were serious. Later, Varela asked her to convince Rupp to help the men. Follette refused. When Varela insisted, Follette spoke to Rupp and Rupp agreed. Even after the men stole the car at the parking lot on the day of the robbery, Follette and Rupp were not certain that the men would carry out their plan to rob the bank.

Follette was originally charged with aiding and abetting the bank robbery and aiding and abetting the use of a firearm during the commission of a crime of violence. Pursuant to an agreement with the government, however, Follette pled guilty to being an accesso-ry after the fact. (Filing 18, Guilty Plea Transcript, 7:18–8:15.) She admitted knowing that the bank robbery had been committed and then helping Varela and Marmolejo to prevent and hinder their apprehension. (*Id.* at 27:14–29:5.) The government dismissed the aiding and abetting charges because of the agreement. (*Id.* at 24:7–21.)

## C. Dr. Gutnik's Opinion About Diminished Capacity

After Follette entered her plea of guilty, defense counsel retained Dr. Bruce D. Gutnik. His task was to decide whether Follette suffered from a significantly diminished mental capacity at the time of the offense that contributed to the commission of the crime.

Dr. Gutnik is an experienced board-certified psychiatrist who has qualified as an expert witness in numerous criminal cases. Dr. Gutnik has served as the psychiatric consultant to the Douglas County Jail, and in that capacity he has dealt with many people who feign mental illness to excuse their criminal behavior. (Ex. A, Dep. of Bruce D. Gutnik, M.D., 24:2–19.)

Dr. Gutnik's investigation of Follette's mental status at the time of the offense consisted of three parts. Dr. Gutnik interviewed Christy Van Ness. Van Ness knew Follette and had the opportunity to observe her two weeks before the robbery. The doctor also examined Follette's medical records, including those from the University of Nebraska Medical Center and St. Joseph's Center for Mental Health. Dr. Gutnik also examined Follette.

Dr. Gutnik was of the opinion to a reasonable degree of medical certainty that Follette suffered from significantly reduced mental capacity on the date of the crime. (Ex. A, 6:7–20.) Dr. Gutnik was also of the opinion that Follette's reduced mental capacity contributed to the commission of the crime. (*Id.* at 7: 2–21.) According to Gutnik, Follette suffered from a Cyclothymic Disorder and possibly a Bipolar Disorder.[15] At the time of the examination in September of 1997, Follette's GAF score was 50 and the doctor

---

**15.** Gutnik also indicated that he could not rule out posttraumatic stress disorder because of her history, but he saw no evidence of such a disor-der at the time of Follette's examination. (Ex. A, 31:22–32:10.)

estimated that her lowest GAF score during the past year was 30.

According to Gutnik, a Cyclothymic Disorder is similar to a Bipolar Disorder except that mood swings are more rapid. (Ex. A, 8:1–10:3.) [16] People who suffer from this disease have depressive and manic moods that "vary significantly from hour to hour." (Id. at 10:2–3.) [17] Lithium is the treatment of choice for this disorder, just as it is for Bipolar Disorder. (Id. at 32:25–33:1.)

Cyclothymic Disorder is a result of a chemical imbalance, probably caused by a genetic deficiency. (Id. at 33:22–23.) The disease "frequently shows up in early teens or young adulthood and tends to follow a fairly unpredictable course." (Id. at 33:23–25.)

In the manic phase, these individuals have an "unrealistic sense of power" and "tend[] to feel like nothing bad can happen to them, they can do whatever they want and they'll be fine." (Id. at 12:21–23.) In the depressive phase, "they feel insecure, down, alone, lonely, hopeless, helpless" and at those times "an individual who is a very dependent-type person, and Jackie is a very dependent-type person, is very susceptible to suggestion by other people." (Id. at 12:3–8.)

As for the severity of Follette's illness, it was not, for example, so severe as to cause her to jump off a roof without fear of injury. (Id. at 12:24–13:6.) Still, Follette's "judgment was really diminished," particularly "in her ability to say no to" Varela. (Id. at 30:24–25.)

Follette's GAF score of 50 at the time of Gutnik's examination meant that she had "[s]erious symptoms" or suffered from "serious impairment in social, occupational, or school functioning." DSM–IV at 32. Follette's GAF score of 30 during the preceding year meant that her "[b]ehavior is considerably influenced by delusions or hallucina-

tions" or that she suffered from "serious impairment in communication or judgment" or that she had an "inability to function in almost all areas." Id.

As noted earlier, Gutnik believed Follette suffered from a significantly diminished mental capacity at the time of the offense and that her disorder contributed to Follette's involvement in the offense. Summarized and condensed, Gutnik had four reasons for his opinion.

First, Follette's medical history, including Gutnik's examination of her and two prior psychiatric hospitalizations involving self-inflicted injuries, showed that Follette suffered from severe manic-depressive episodes. (Ex. A, 8:1–9:9.) Second, at the time of the offense, Follette was not taking lithium, although it was prescribed for Follette upon her discharge from the St. Joseph Center for Mental Health. (Id. at 7: 14–19.) Third, a few weeks before the offense, Follette married a man at Varela's request though she loved Varela and was pregnant with his child. (Id. at 30:3–31:4.) Fourth, a few weeks before the offense, Christy Van Ness, a close friend who had known Follette since 1995, observed Follette to suffer " 'minute-to-minute-type mood swings' " that were " 'pretty bad' " and Van Ness confirmed that Follette " 'would do anything [Varela] told her to do.' ", (Id. at 17:1–10.) In short, Follette's case was one "where you've got a totally consistent story from years prior to the [offense] through the time of the [offense] through [the present]." (Id. at 25:3–4.)

## II. Mental Illness Departure Law

I will describe the law. Then I will apply the law to the facts.

### A. Mental Illness as a Basis for Departure

Section 5K2.13 of the Sentencing Guidelines allows a judge to depart from the range

---

**16.** See DSM–IV at 361–66. According to the DSM–IV, the essential feature of Cyclothymic Disorder is a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms ... and numerous periods of depressive symptoms. Id. at 363 (internal citations omitted).

**17.** According to the DSM–IV, patients such as these have "numerous periods with hypomanic

symptoms (see p. 338) and numerous periods with depressive symptoms.... " DSM–IV at 365. The manic symptoms may include "excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g., the person engages in unrestrained buying sprees, sexual indiscretions, or foolish business investments)." Id. at 338.

of punishment otherwise called for by the Guidelines: (1) if the defendant committed a nonviolent crime (2) while suffering from a significantly reduced mental capacity that contributed to the commission of the crime, and (3) the illness did not result from voluntary use of drugs or other intoxicants. U.S.S.G. § 5K2.13, p.s. *See also United States v. Risse,* 83 F.3d 212, 217 (8th Cir. 1996) (departure warranted where a defendant suffered posttraumatic stress disorder; the defendant was convicted of being a felon in possession of a firearm and of using a firearm during and in relation to a drug trafficking crime); *United States v. Ruklick,* 919 F.2d 95, 97 (8th Cir.1990) (in a drug case, departure warranted when the defendant suffered from longstanding schizoaffective disorder); *McMurray,* 833 F.Supp. at 1480–84 (bipolar disorder warranted departure in a drug case).

▮ We may grant a downward departure even if the illness was not the "but-for" cause of the crime. *Ruklick,* 919 F.2d at 97–98. In other words, a downward departure is warranted when "defendant's diminished capacity comprised *a contributing factor* in the commission of the offense." *Id.* (emphasis added). Such a conclusion follows because section 5K2.13 provides that a downward departure "may be warranted to reflect the extent to which reduced mental capacity *contributed* to the commission of the offense." U.S.S.G. § 5K2.13, p.s. (emphasis added).

### B. Is This a Proper Case for Departure?

▮ I must first determine whether Follette's crime was a "crime of violence." If Follette's crime was crime of violence, then, as a categorical matter, she is not entitled to a departure because section 5K2.13 precludes departures where the offense is other than "a non-violent offense." U.S.S.G. § 5K2.13, p.s. *See also United States v. Mayotte,* 76 F.3d 887, 888–89 (8th Cir.1996) (the term "non-violent offense" used in U.S.S.G. § 5K2.13 excludes "crime of violence" defined in U.S.S.G. § 4B1.2; bank robbery conviction of a defendant who suffered from bipolar disorder, who was not taking lithium, precluded downward departure because the bank robbery statute and the definition of "crime of violence" found in U.S.S.G. § 4B1.2(1)(i) both

require the element of " 'use, attempted use, or threatened use of physical force against the person of another' ") (comparing 18 U.S.C. § 2113(a) with U.S.S.G. § 4B1.2).

Follette's crime of being an accessory after the fact—knowing that a bank robbery had been committed and then helping the robbers to prevent and hinder their apprehension— has no component of violence as an element of the crime. Moreover, none of the facts establish that Follette used, attempted to use, or threatened the use of physical force against another person while committing the offense of conviction. Accordingly, since Follette's behavior as an accessory after the fact did not involve violence, there is no reason categorically to preclude her from consideration of a downward departure.

The government argues that under section 4B1.2 a "crime of violence" includes persons who aided or abetted a substantive crime of violence, and therefore Follette is categorically excluded from the benefit of a diminished capacity departure. *See* U.S.S.G. § 4B1.2, comment. n. 1 ("The term[] 'crime of violence' ... include[s] the offense[] of aiding and abetting ... such offense[].") The premise of the government's argument ("aiding and abetting" a "crime of violence" is like a violent crime for Guideline purposes) accurately states the law. The conclusion of the government's assertion, however, is faulty.

Follette was not convicted of "aiding and abetting" a crime of violence. The government gave up any aiding and abetting claim when it agreed to dismiss the aiding and abetting charges. In fact, with the agreement of the government, Follette was convicted of being an accessory *after* the fact.

▮ The Guidelines state that "[u]nder this section, *the conduct of which the defendant was convicted is the focus of inquiry*." *Id.* at comment. (n. 2) (emphasis added). The offense of being an accessory after the fact does not have "as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(1)(i). As a matter of relevant conduct, Follette did nothing violent when she helped the robbers avoid apprehension after the crime. It follows, therefore,

that Follette's offense is "non-violent" for purposes of section 5K2.13, p.s. *Mayotte,* 76 F.3d at 888–89.

I must next determine whether Follette committed the crime while suffering from a significantly reduced mental capacity that contributed to the commission of the crime. Follette has established that she suffered from a significantly reduced mental capacity. She has also established that the incapacity substantially contributed to the commission of the crime. My reasons for these conclusions mirror Dr. Gutnik's reasons.

Follette has a well-documented medical history establishing the existence of a recognized organic mental illness that causes severe mood swings and impairs judgment. For example, she harmed herself on two separate occasions before the offense, and she had to be placed in a psychiatric hospital both times. The illness was sufficiently severe that two years before the offense she was prescribed lithium in an amount that is consistent with the treatment of acute mania. She was not taking lithium at the time of the offense although lithium is used as a maintenance therapy to reduce or eliminate manic symptoms. Two weeks before the offense a witness observed that Follette was suffering from "minute-to-minute" mood swings that significantly impaired her judgment. For example, at the request of one robber she married another man although she loved the robber and was pregnant with his child.

Finally, there is no claim that the voluntary use of drugs or other intoxicants caused Follette's offense or illness. Specifically, the PSR shows that unlike many criminal defendants, Follette's use of drugs or alcohol has been minimal. PSR ¶ 58.

In summary, Follette suffers from a severe mental illness that contributed substantially to the commission of a non-violent offense. Drugs and alcohol played no part in her illness or offense. Accordingly, I will depart downward under section 5K2.13, p.s.

### III. Extent of Departure

█ Under section 5K2.13, the "degree of departure" is a matter of discretion for the district court, but any departure must be "reasonable." *Risse,* 83 F.3d at 217. In particular, we should not impose a probationary sentence if the defendant's criminal history suggests "a need for incarceration to protect the public." U.S.S.G. § 5K2.13, p.s.

After appropriate adjustments, Follette's total offense level is 19. PSR ¶ 40.[18] She has never been convicted of another crime. She has no prior juvenile adjudications. Her criminal history score is thus "0" and her criminal history category is I. PSR ¶ 45. Accordingly, the Guideline range for custody purposes is 30 to 37 months in prison. PSR ¶ 67.

█ A probationary sentence of five years, including (but not limited to) six months of home confinement under electronic monitoring, community service, and intensive court-ordered treatment with a board-certified psychiatrist, is an appropriate sentence. Such a sentence will reduce the likelihood that Follette will commit another crime because it will force Follette to address her illness on a continuous basis over an extended period under the close supervision of a probation officer and a board-certified psychiatrist. Such a sentence will appropriately punish her and deter others. On the other hand, such a sentence will not unduly punish Follette for a crime that a very severe mental illness largely caused. In arriving at this sentence, I have carefully considered the statutory goals and factors related to sentencing. 18 U.S.C. § 3553(a) (setting forth factors to be considered in imposing a sentence).

In particular, such a sentence will not cause an unwarranted sentencing disparity. My sentence will have departed from the custodial range by 30 months; that is, from 30 months in prison (the bottom of the range) to probation with six months of home confinement. The extent of such a departure is consistent with precedent in this circuit. *See Risse,* 83 F.3d at 215, 217 (affirming a 39-month departure from the bottom of the range; departure based on overrepresentation of criminal history and diminished capacity; a felon in possession of a firearm).

For these reasons,

IT IS ORDERED that Follette's motion for departure based upon diminished capaci-

---

18. Neither Follette nor the government have objections to the PSR.

ty (filing 21) is granted, and a sentencing date will be set by separate order.